*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0147p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

VONLEE NICOLE TITLOW,

*Petitioner-Appellant,*

*v.*

No. 10-2488

SHERRY L. BURT, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-13614—Marianne O. Battani, District Judge.

Argued: January 17, 2012

Decided and Filed: May 22, 2012

Before: BATCHELDER, Chief Judge; CLAY and GILMAN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Laura Kathleen Sutton, Manchester, Michigan, for Appellant. Laura Graves Moody, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Laura Kathleen Sutton, Manchester, Michigan, for Appellant. John S. Pallas, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

GILMAN, J., delivered the opinion of the court, in which CLAY, J., joined. BATCHELDER, C. J. (pp. 20–24), delivered a separate dissenting opinion.

---

## OPINION

---

RONALD LEE GILMAN, Circuit Judge. Vonlee Nicole Titlow, a transgender prisoner presently incarcerated at the Richard A. Handlon Correctional Facility in Ionia, Michigan, appeals from the district court's denial of her petition for a writ of habeas corpus following her conviction in state court for the second-degree murder of her uncle.

1

Titlow raises several ineffective-assistance-of-counsel claims, as well as a prosecutorial-misconduct claim and a challenge to the trial court's response to a question from the jury.

Although the district court correctly determined that most of Titlow's claims lack merit or are procedurally defaulted, the court erred in concluding that Titlow failed to establish an ineffective-assistance-of-counsel claim arising out of her plea-bargaining experience. The Michigan Court of Appeals' conclusion that her second attorney was not deficient when he advised Titlow to withdraw the plea agreement negotiated by her first attorney was unreasonable because the record reflects that the second attorney totally failed to investigate her case prior to recommending that she withdraw the guilty plea. In contrast to the 7-to-15-year sentence that Titlow would have received under the plea agreement, she was convicted by a jury and sentenced to 20-to-40 years in prison. For the reasons set forth below, we **REVERSE** the judgment of the district court and conditionally **GRANT** the petition for a writ of habeas corpus, giving the State 90 days to reoffer Titlow the original plea agreement or, failing that, to release her.

## I. BACKGROUND

A Michigan jury convicted Titlow of the second-degree murder of her uncle, Donald Rogers, an offense that took place in August 2000. At the time of the offense, Titlow was living with her uncle and his wife, Billie Rogers. Donald was an alcoholic and allegedly wealthy. In the early morning hours of August 12, 2000, police officers were dispatched to the Rogers' residence in Troy, Michigan, where they found Donald dead on the kitchen floor with a drinking glass in his hand. Titlow and Billie told the officers that they had found Donald dead on the floor when they returned from gambling at a casino—a regular pastime of Billie's—during the middle of the night. But the officers noted that several aspects of the crime scene and of the women's behavior appeared inconsistent with what Titlow and Billie were telling them.

Although Donald's body was taken to the medical examiner's office, no autopsy was ever performed. The medical examiner initially determined that the cause of

Donald's death was a heart attack, with arterial sclerotic cardiovascular disease (related to his alcoholism) as a contributing factor. His body was cremated before any further examination was conducted. Some time later, however, Donald's death certificate was amended to list asphyxia by smothering as the cause of death, with acute alcohol intoxication as a contributing factor. The amendment was based on photographs of the corpse that showed small scrapes around Donald's nose consistent with impressions made by a decorative woven pillow.

Several days after Donald's death, the officers interviewed Danny Chahine, Titlow's paramour. Titlow had treated Chahine to dinner shortly before the police interview and had filled him in on some of the events that led to Donald's death. Chahine informed the police that Titlow had previously told him that Billie wanted to get rid of her husband and was willing to pay Titlow $25,000 to do so. At the dinner, Titlow told Chahine that she and Billie had found Donald passed out on the kitchen floor when they returned from the casino. Billie then suggested that they pour vodka down Donald's throat while holding his nose shut, and she began doing so herself. Titlow initially balked, but at Billie's encouragement began pouring a small amount of vodka down Donald's throat and held his mouth shut. Titlow soon relented, however, stopped Billie from pouring more vodka down Donald's throat, and walked away. (The evidence suggests that Billie later smothered Donald with a pillow when Titlow left the room.) After his interview with the police, Chahine agreed to wear an audio recording device during a subsequent dinner with Titlow, at which time Titlow again recounted the details surrounding Donald's death and asked Chahine to serve as an alibi for her and Billie.

Billie was the sole beneficiary of Donald's estate. Shortly after his death, she purchased new cars for herself and Titlow with money transferred from one of Donald's bank accounts. She also wrote Titlow a check for $70,260, which Titlow used to open a certificate-of-deposit account, and gave Titlow gambling money that Billie deducted from a ledger with $100,000 written on it. Billie also sent large sums of money to her own daughter and mother.

Titlow and Billie were arrested on first-degree murder charges in January 2001. The State decided to try them separately for their involvement in the crime. Attorney Richard Lustig represented Titlow and negotiated a plea agreement on her behalf. Under the agreement, the State offered to reduce Titlow's charges to manslaughter, with a 7-to-15-year sentence, on the conditions that Titlow plead guilty, submit to a lie-detector test, testify against Billie at trial, and not challenge the prosecutor's recommended sentencing range on appeal.

The state trial court held a plea hearing in October 2001. Titlow confirmed that she had reviewed all the evidence with her attorney, understood the facts that could support a conviction of first-degree murder, and was aware that the proposed sentencing range exceeded the standard guidelines range for a manslaughter conviction in Michigan. She also admitted to pouring vodka down Donald's throat shortly before Billie smothered Donald to death and to receiving $100,000 to remain silent about Billie's actions. The court accepted the plea agreement and scheduled the matter for sentencing in December 2001.

During her confinement in a local jail between these hearings, Titlow spoke with Eric Ott, a sheriff's deputy assigned to the jail, who advised her not to plead guilty if she believed that she was innocent. Ott referred Titlow to attorney Frederick Toca, who agreed to represent her in exchange for some jewelry and the media rights to her case. The record contains no details about Toca's conversations with Titlow before November 29, 2001, the date set by the court to hear the motion filed by Toca to withdraw Titlow's guilty plea.

On the record, the State represented that it previously had conversations with Toca in which Toca represented that Titlow would not testify against Billie unless Titlow's recommended sentencing range was reduced to 3-to-15 years. Toca asserted at the sentencing hearing that he "felt that the offer [of 7-to-15 years] was out of line, that seven years is outside of Ms. Von Lee [sic] Titlow's guidelines. Her guidelines are actually two to five. . . . Based upon [the State's refusal to accept a lower sentencing range], your Honor, we are withdrawing."

Toca also noted that he had been "retained last week" and that "[t]here's a lot of material here" that he still needed to review prior to trial. Titlow acknowledged her understanding that the first-degree murder charge would be reinstated if she withdrew her guilty plea. At no point during the November 2011 hearing did either Titlow or Toca mention Titlow's alleged assertions of innocence to Deputy Ott. The court ultimately allowed Titlow to withdraw her plea because she was declining to testify at Billie's trial.

Toca did not obtain Titlow's file, inspect the government's discovery materials, or speak with Lustig (Titlow's former counsel) about the case until January 10, 2002, approximately a month and a half *after* the plea-withdrawal hearing. This despite the fact that Lustig had made the file available to Toca around the time of the November 29, 2001 hearing, which was when Toca officially substituted himself as Titlow's counsel. All of this information was presented to the Michigan Court of Appeals on Titlow's direct appeal.

Soon after obtaining the file, Toca moved to withdraw as counsel, citing a breakdown in communications and a lack of funds to proceed with the defense. At a hearing in February 2002, the court questioned Toca's budgetary constraints (which was his stated reason for failing to order the transcripts from Billie's recently concluded trial) and learned about his questionable financial agreement with Titlow. The court then appointed William Cataldo as Titlow's trial counsel.

Titlow's case proceeded to trial in March 2002. The State's theory of the case was that Titlow helped Billie kill Donald in order to obtain money for a sex-change operation, since Titlow, although born a man, had been living as a woman for many years. Titlow offered several theories in her defense: that she was merely present and did not participate in the murder; that she had abandoned any intent to aid in the murder and was guilty of a lesser crime only; and that Donald died from acute, self-induced intoxication rather than anything that she had done.

At trial, Titlow took the stand in her own defense. She admitted to putting her hand over Donald's mouth after Billie poured vodka down his throat. Titlow further confirmed that she poured some vodka as well, but in a much smaller quantity. She also

testified that she ultimately stopped Billie from giving Donald more alcohol and then left the room. When she returned, she saw Billie holding a pillow over Donald's face. Titlow conceded that she accepted Billie's money as a bribe to keep silent.

The jury convicted Titlow of second-degree murder, and the court sentenced her to 20-to-40 years in prison. At her sentencing hearing, Titlow stated that she "would have testified against Billie during her trial, had I not been persuaded to withdraw my plea agreement and the chance to testify, because an attorney promised me he would represent me. . . . I don't know a lot about the law, because I've never been in serious trouble before. So I trusted what he was saying." Billie, in contrast, was acquitted after her jury trial, but no further details about her trial have been included in the present record.

The Michigan Court of Appeals affirmed Titlow's sentence on direct appeal and rejected all of her constitutional challenges. *People v. Titlow*, No. 241285, 2003 WL 22928815, at *1 (Mich. Ct. App. Dec. 11, 2003) (per curiam) (unpublished opinion). Leave to appeal was denied by the Michigan Supreme Court. *People v. Titlow*, 680 N.W.2d 900 (Mich. May 28, 2004) (unpublished table opinion). Titlow then filed a motion for relief from judgment in the state trial court, which was denied. The Michigan Court of Appeals subsequently denied leave to appeal "because defendant has failed to meet the burden of establishing entitlement to relief under [Michigan Court Rule] 6.508(D)," *People v. Titlow*, No. 273274, slip op. at 1 (Mich. Ct. App. Apr. 27, 2007) (unpublished opinion), and the Michigan Supreme Court did the same, *People v. Titlow*, 738 N.W.2d 715 (Mich. Sept. 24, 2007) (unpublished table opinion).

Titlow filed her petition for a writ of habeas corpus under 28 U.S.C. § 2254 in August 2007. The district court issued an opinion denying the petition in October 2010, but granted a certificate of appealability on all of Titlow's claims. This timely appeal followed.

## II.  ANALYSIS

### A.    Standard of review

A district court's legal conclusions in a habeas case are reviewed de novo and its factual findings are reviewed under the clear-error standard.  *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008).  The state-court decision under review is entitled to deference pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which is codified at 28 U.S.C. § 2254(d).  That subsection provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state-court decision is considered "contrary to" clearly established federal law under § 2254(d)(1) if the two are "diametrically different, opposite in character or nature, or mutually opposed."  *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (internal quotation marks omitted).  Alternatively, to be deemed an "unreasonable application" of clearly established federal law under that subsection, a state-court decision on the merits must be "objectively unreasonable," *id.* at 409, not simply incorrect, *id.* at 412.

In order to demonstrate that the state court's decision was based on an unreasonable determination of the facts under § 2254(d)(2), a petitioner must both establish the "unreasonable determination" and show "that the resulting state court decision was 'based on' that unreasonable determination."  *Rice v. White*, 660 F.3d 242,

250 (6th Cir. 2011). We may take into account only "the record that was before the state court that adjudicated the claim on the merits" when evaluating an AEDPA claim. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). The state court's findings of fact are presumed to be correct unless they are rebutted by clear and convincing evidence. *Benge v. Johnson*, 474 F.3d 236, 241 (6th Cir. 2007). As a result, "even if reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination" unless that determination is unreasonable. *Wood v. Allen*, 130 S. Ct. 841, 849 (2010) (alterations and internal quotation marks omitted). "The standard is demanding but not insatiable," and the Supreme Court has noted that "deference does not by definition preclude relief." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (brackets and internal quotation marks omitted).

In short,

> "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011). Not every constitutional error in a state-court proceeding therefore merits the issuance of a writ of habeas corpus. *Williams*, 529 U.S. at 375. But those that "undermine confidence in the fundamental fairness of the state adjudication certainly justify the issuance of the federal writ." *Id.*

## B.     Ineffective assistance of interim counsel Frederick Toca

### 1.     *Applicable law*

The Sixth Amendment to the U.S. Constitution guarantees criminal defendants the right to the assistance of counsel during their criminal proceedings. *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984). This right extends to the plea-bargaining process, during which defendants are "entitled to the effective assistance of competent counsel." *Lafler v. Cooper*, 132 S. Ct. 1376,  1384 (2012) (internal quotation marks

omitted).  "[T]he right to adequate assistance of counsel cannot be defined or enforced without taking account of the central role plea bargaining plays in securing convictions and determining sentences."  *Id.* at 1388.

In *Hill v. Lockhart*, 474 U.S. 52 (1985), the Supreme Court held that the test established in *Strickland*, which addresses ineffective assistance of counsel at the trial stage, applies equally to the plea-bargaining process.  *Hill*, 474 U.S. at 58-59 (concluding that the defendant had not demonstrated that his counsel was ineffective in erroneously advising him about the parole-related conditions set forth in the proposed plea agreement because the defendant failed to allege that he would have rejected the plea but for counsel's advice); *see also Lafler*, 132 S. Ct. at 1384 (reaffirming that the *Strickland* analysis applies to ineffective-assistance-of-counsel claims arising out of the plea-bargaining process).

There are two components to the *Strickland* test for violations of a defendant's right to the effective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

*Strickland*, 466 U.S. at 687.

When evaluating counsel's performance under the first step of *Strickland*, we apply a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Id.* at 690; *see also Pough v. United States*, 442 F.3d 959, 966 (6th Cir. 2006) (cautioning that courts should not "indulge in hindsight, but must evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors" (internal quotation marks omitted)).  "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one."  *Harrington*, 131 S. Ct. at 788.  A defendant challenging her attorney's conduct during plea bargaining therefore

bears "a heavy burden," *Whiting v. Burt*, 395 F.3d 602, 617 (6th Cir. 2005), and "must show that counsel did not attempt to learn the facts of the case and failed to make a good-faith estimate of a likely sentence." *Short v. United States*, 471 F.3d 686, 692 (6th Cir. 2006) (internal quotation marks omitted).

Although "[t]he decision to plead guilty—first, last, and always—rests with the defendant, not his lawyer," this court has nonetheless maintained that "the attorney has a clear obligation to fully inform her client of the available options." *Smith v. United States*, 348 F.3d 545, 552 (6th Cir. 2003). "A failure to provide professional guidance to a defendant regarding his sentence exposure prior to a plea may constitute deficient assistance." *Moss v. United States*, 323 F.3d 445, 474 (6th Cir. 2003) (citing the habeas case of *Magana v. Hofbauer*, 263 F.3d 542, 550 (6th Cir. 2001)). Defense counsel thus carries the "paramount" duty to "ensure that the client's decision [to waive his constitutional right to trial] is as informed as possible." *Miller v. Straub*, 299 F.3d 570, 580 (6th Cir. 2002). "A criminal defendant has a right to expect at least that his attorney will review the charges with him by explaining the elements necessary for the government to secure a conviction, discuss the evidence as it bears on those elements, and explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available." *Smith*, 348 F.3d at 553.

Supporting this duty is the concomitant obligation of conducting "reasonable investigations or [reaching] a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "Counsel cannot responsibly advise a client about the merits of different courses of action, [and] the client cannot make informed decisions, . . . unless counsel has first conducted a thorough investigation . . . ." *Dickerson v. Bagley*, 453 F.3d 690, 694 (6th Cir. 2006) (noting that such an investigation "should begin as quickly as possible" in order to aid in plea negotiations (internal quotation marks omitted)). The Sixth Amendment does not require that counsel provide an absolutely *correct* assessment of the comparative risks of a guilty plea versus a trial, but the Supreme Court has "recognize[d] that counsel must at least be *aware* of such risks, especially where the lack of awareness directly impacts the reasoning behind

whatever advice is provided." *Miller*, 299 F.3d at 584 (Gilman, J., concurring) (emphasis added) (discussing *McMann v. Richardson*, 397 U.S. 759, 770 (1970)).

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," but "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. "It is not reasonable to refuse to investigate when the investigator does not know the relevant facts the investigation will uncover." *Dickerson*, 453 F.3d at 696. If an attorney's "failure to investigate does not reflect sound professional judgment," deference to the attorney's purported strategic choices is "not appropriate." *Dando v. Yukins*, 461 F.3d 791, 799 (6th Cir. 2006) (refusing to defer to the attorney's decision not to invest resources in a valid and available defense because the decision represented a misunderstanding of the applicable law rather than sound professional judgment).

To meet the prejudice prong of the *Strickland* test in the context of a rejected plea offer,

> a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler v. Cooper*, 132 S. Ct. 1376, 1385 (2012). "A reasonable probability," as the Supreme Court has previously defined the term, "is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. This burden is relatively low, being less than a preponderance of the evidence. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (noting that a state-court decision applying a preponderance-of-the-evidence standard to a question of attorney competence would be contrary to *Strickland*'s holding "that the prisoner need only demonstrate a 'reasonable probability'"

of a different outcome); *Cornwell v. Bradshaw*, 559 F.3d 398, 405 (6th Cir. 2009) (explaining that a reasonable probability is "less than a preponderance of the evidence").

The Supreme Court has recently indicated that the simple fact of a higher sentence after trial is sufficient to demonstrate prejudice. *See Lafler*, 132 S. Ct. at 1387 ("[P]rejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence."). And this court has recognized that a substantial disparity between the plea offer and the post-trial sentence provides evidence that the defendant would have accepted the plea. *See, e.g.*, *Smith*, 348 F.3d at 552 (recognizing the Sixth Circuit's adoption of this evidentiary principle in a case involving a 60-month plea offer versus a 156-month sentence); *Magana v. Hofbauer*, 263 F.3d 542, 551-52 (6th Cir. 2001) (involving a 10-year plea offer versus a sentence of two consecutive 10-to-20-year terms).

A defendant's conduct and statements during plea negotiations may also factor into our prejudice analysis. *See, e.g.*, *Magana*, 263 F.3d at 552 (concluding that a comment made by the defendant during plea negotiations was enough to show a reasonable probability that he would have accepted the plea). But this court has not considered declarations of innocence clear evidence of a defendant's knowing rejection of a plea offer because defendants may have legitimate reasons for continuing to maintain their innocence during and even after plea negotiations. *See Smith*, 348 F.3d at 551-52 (listing several reasons why a defendant might want to continue asserting his innocence and yet be amenable to a plea offer). And, unlike some circuits, this court does not require "that a defendant must support his own assertion that he would have accepted the offer with additional objective evidence." *Id.* at 551 (internal quotation marks omitted).

We may therefore consider affidavits submitted by the defendant during his state-court appeals as well as other statements made by the defendant throughout the proceedings. *Id.* (overturning the lower court's conclusion that the defendant had failed to support his ineffective-assistance-of-counsel claim and directing the court to consider the defendant's "own self-serving testimony"). Affidavits furnished by counsel,

however, receive more scrutiny and should explain not only that the defendant "was aware of a plea offer," but also that the attorney "actually discussed the terms of the agreement with" the defendant, informed the defendant "of the dramatically higher sentence potential" that he or she faced at trial, and explained the likelihood of not prevailing at trial. *Id.* at 553.

### 2.       *Analysis*

On direct appeal, the Michigan Court of Appeals considered evidence not presented to the trial court concerning Titlow's conversations with Sheriff's Deputy Eric Ott, who was assigned to the jail where Titlow was being held, and concluded as follows:

> The record discloses that the second attorney's advice was set in motion by defendant's statement to a sheriff's deputy that [s]he did not commit the offense. Defendant offers the affidavit of [her] first attorney, who negotiated a plea agreement that he thought was in defendant's best interests. When a defendant proclaims [her] innocence, however, it is not objectively unreasonable to recommend that the defendant refrain from pleading guilty—no matter how "good" the deal may appear. We therefore reject defendant's argument that [her] second attorney gave [her] "grossly erroneous advice." On the proofs and arguments offered by defendant, defendant has failed to demonstrate that [her] second attorney's advice to withdraw [her] plea fell below an objective standard of reasonableness.

*People v. Titlow*, No. 241285, 2003 WL 22928815, at *2 (Mich. Ct. App. Dec. 11, 2003) (per curiam) (unpublished opinion) (footnotes omitted).

But the Court of Appeals' conclusion is undermined by the statements that Toca, Titlow's second attorney, made on the record at the hearing to withdraw Titlow's plea. Toca did not refer to Titlow's claims of innocence at any point throughout the hearing. Instead, Toca explained that the decision to withdraw Titlow's plea was based on the fact that the State's plea offer was substantially higher than the Michigan guidelines for second-degree murder. The reason that Toca offered thus explicitly conflicts with the rationale on which the Michigan Court of Appeals relied. This sufficiently rebuts the Michigan Court of Appeals' finding that the plea withdrawal was based on Titlow's

assertion of innocence. *See Benge v. Johnson*, 474 F.3d 236, 241 (6th Cir. 2007) (stating the general rule that a state court's findings of fact are presumed correct unless rebutted by clear and convincing evidence).

Moreover, even where counsel properly advises a client that she has the right to go to trial if she maintains her innocence, this advice must be cabined by a larger discussion in which counsel "fully inform[s the] client of the available options," *Smith*, 348 F.3d at 552, and "ensure[s] that the client's decision is as informed as possible," *Miller*, 299 F.3d at 580. The record in this case contains no evidence that Toca "explain[ed] the elements necessary for the government to secure a conviction, discuss[ed] the evidence as it bears on those elements, [or] explain[ed] the sentencing exposure the defendant [would] face as a consequence of exercising each of the options available." *See Smith*, 348 F.3d at 553. We therefore conclude that Toca failed to fulfill his "clear obligation" to provide sufficient advice to Titlow during the plea-negotiation stage. *See id.* (noting that affidavits from counsel furnished for post-conviction review should detail counsel's conversations with the defendant in order to adequately refute an ineffective-assistance-of-counsel claim).

The Michigan Court of Appeals acknowledged the affidavit from Lustig, Titlow's initial counsel, which advanced Lustig's conclusion that the plea agreement was in Titlow's best interests. But the court concluded that Lustig's belief alone was insufficient to demonstrate that Toca performed ineffectively. In so concluding, however, the Court of Appeals failed to address the final paragraph of Lustig's affidavit, in which he avers "[t]hat Mr. Toca did not pick up the discovery materials from my office, nor discuss the facts of this case with me until January 10, 2002 as evidenced by the attached Acknowledgment of Receipt signed by Mr. Toca, although said file was made available to him on or about November 29, 2001, the time of his substitution."

Toca thus had no way to adequately advise Titlow on her sentencing exposure at trial or on the reasonableness of the plea offer without first examining the evidence that the State had against her. But Toca did not have this material in his possession when he rendered his advice to Titlow and did not receive it until shortly before he

sought to withdraw as counsel. The Supreme Court has long held that counsel has an obligation to conduct a "reasonable investigation," *see Strickland v. Washington*, 466 U.S. 668, 691 (1984), such that counsel would become aware of the risks of withdrawing the plea, "especially where the lack of awareness directly impacts the reasoning behind whatever advice is provided," *Miller*, 299 F.3d at 584 (citing *McMann v. Richardson*, 397 U.S. 759, 770 (1970)).

In the present case, the State's evidence against Titlow clearly would have had (or clearly *should* have had) a major impact on Toca's advice during plea negotiations. The failure to obtain Titlow's file (a rather easy task) before offering any advice was therefore totally inconsistent with a reasonable investigation. *See Dickerson v. Bagley*, 453 F.3d 690, 696 (6th Cir. 2006) ("It is not reasonable to refuse to investigate when the investigator does not know the relevant facts the investigation will uncover.").

Nor can we conclude that this fundamental omission reflected sound professional judgment or a strategic choice. *Cf. McMann*, 397 U.S. at 771 (requiring that counsel offer advice that is "within the range of competence demanded of attorneys in criminal cases"); *Dando v. Yukins*, 461 F.3d 791, 798-99 (6th Cir. 2006) (giving examples of defense counsel's actions that would not constitute sound professional judgment). For that reason, we need not afford deference to Toca's actions. *See Dando*, 461 F.3d at 799 ("Although courts are typically required to show heightened deference to an attorney's strategic decisions supported by professional judgment, where a failure to investigate does not reflect sound professional judgment, such deference is not appropriate."); *see also Strickland*, 466 U.S. at 690-91 (holding that, if counsel does not conduct a complete investigation, any allegedly strategic choices made thereafter may be considered reasonable only to the extent that the reasons for limiting the investigation can be considered reasonable).

In short, Toca "did not attempt to learn the facts of the case." *See Short v. United States*, 471 F.3d 686, 692 (6th Cir. 2006) (defining deficient performance as including situations where "counsel did not attempt to learn the facts of the case," but ultimately denying the defendant's ineffective-assistance-of-counsel claim on the facts presented

(internal quotation marks omitted)).   Here, Toca's performance during the plea-bargaining stage was clearly deficient under the first element of the *Strickland* analysis.

Titlow must next demonstrate, under *Strickland*'s second element, "a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe" than the punishment that she ultimately faced.  *See Lafler v. Cooper*, 132 S. Ct. 1376, 1385 (2012).  Here, the facts speak for themselves:  the plea offer was presented to and accepted by the state trial court at Titlow's initial plea hearing in October 2001.  And no one disputes that the sentence Titlow ultimately received (20-to-40 years' imprisonment) was nearly three times the punishment that she was offered under the plea agreement (7-to-15 years' imprisonment).  *See id.* at 1386 (noting that a sentence following trial that was three-and-a-half times more severe than the one offered in the plea agreement was evidence of prejudice).

Furthermore, Titlow's position that would she have accepted the plea offer but for Toca's intervening advice is bolstered by the fact that she had actually accepted the plea on the record at the October 2001 hearing.  During her sentencing hearing following trial in March 2002, she reiterated this fact.  We may consider this testimony as evidence of Titlow's intent.  *See Smith*, 348 F.3d at 551 (determining that the district court could consider the defendant's testimony despite the court's description of this testimony as "self-serving").

The State's evidence against Titlow was strong.  Even Titlow's version of the facts was not inconsistent with a second-degree murder conviction, and her recorded conversation with her paramour Chahine was highly incriminating.  Toca's timely discovery of the State's evidence against Titlow likely would have (or at least should have) led him to change his recommendation as to withdrawing the plea.  *See Hill v. Lockhart*, 474 U.S. 52, 59 (1985) (noting that the prejudice inquiry under the second

prong of *Strickland* depends "on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea").

We therefore conclude that Titlow's Sixth Amendment rights were violated when Toca provided ineffective assistance of counsel at the plea-bargaining stage. The Michigan Court of Appeals' decision to the contrary unreasonably determined the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2). Because we reach this conclusion, we need not address the remainder of Titlow's claims for habeas relief.

### 3.     *Appropriate remedy*

The Supreme Court recently addressed the appropriate remedy for a similar constitutional violation in *Lafler*, noting that "Sixth Amendment remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." 132 S. Ct. at 1388 (internal quotation marks omitted). In the typical case where the sole injury suffered by the defendant was a higher sentence, "the court may exercise discretion in determining whether the defendant should receive the term of imprisonment the government offered in the plea, the sentence [s]he received at trial, or something in between." *Id.* at 1389.

But Titlow's situation is not such a simple case for two reasons. The first is that, by foregoing the plea agreement to a manslaughter charge, Titlow was convicted on the higher charge of second-degree murder. And second, the plea agreement's favorable sentencing terms were presumably based in large part on Titlow's willingness to testify against Billie. Following the revocation of her plea agreement, however, Titlow did not in fact so testify. Billie was acquitted and thus cannot be retried (she is also now deceased). The State, therefore, has lost the major benefit that it sought from the initial plea agreement.

In such a case, the Supreme Court has recognized that "resentencing based on the conviction at trial [and under the terms of the former plea agreement] may not suffice" because "[t]he time continuum makes it difficult to restore the defendant and the prosecution to the precise positions they occupied prior to the rejection of the plea

offer." *Id.* at 1389. Instead, "the proper exercise of [the state court's] discretion to remedy the constitutional injury may be to require the prosecution to reoffer the plea proposal." *Id.* Provided that Titlow on remand accepts the proffered plea agreement, the state trial court would then have the discretion "to vacate the conviction from trial and accept the plea or leave the conviction undisturbed." *Id.* In any event, the state court should continue to recognize the former plea offer as a "baseline [that] can be consulted" in fashioning the appropriate remedy. *Id.*

We remain concerned that the remedy articulated in *Lafler* could become illusory if the state court chooses to merely reinstate Titlow's current sentence. But *Lafler* cautions that state courts must at least "consult[]" the initial plea agreement in crafting a new sentence for the defendant, which indicates—sufficiently for now—that the state court's discretion is not entirely unfettered. The proper scope of this discretion need not be considered unless the state court imposes a sentence greater than the initial plea agreement. What remedy Titlow might have in federal court if such occurs is an issue to be resolved another day.

Because we conclude that Titlow's Sixth Amendment right to counsel during the plea-bargain process was violated and because the initial plea offer was to a lesser-included offense instead of the offense of conviction, we will reverse the judgment of the district court and conditionally grant the petition for a writ of habeas corpus, giving the State 90 days to reoffer Titlow the original plea agreement or, failing that, to release her. If the State in fact reoffers the plea agreement and Titlow accepts, the state court may then exercise its discretion to fashion a sentence for Titlow that both remedies the violation of her constitutional right to the effective assistance of counsel and takes into account any concerns that the State might have regarding the loss of Titlow's testimony against her aunt.

### III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and conditionally **GRANT** the petition for a writ of habeas corpus, giving the State 90 days to reoffer Titlow the original plea agreement or, failing that, to release her.

———————

**DISSENT**

———————

ALICE M. BATCHELDER, Chief Judge, dissenting. I must respectfully dissent from the majority's decision because, in my view, the Michigan Court of Appeals's denial of Titlow's ineffective assistance claim was reasonable. Our review of the Michigan Court of Appeals's application of *Strickland* is "doubly deferential," as we must "take a highly deferential look at counsel's performance through the deferential lens of § 2254(d)." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (internal citation and quotation marks omitted). The Michigan Court of Appeals properly denied Titlow's claim because the record does not establish that advice from her counsel, Frederick Toca, was the reason Titlow chose to withdraw her plea. But even if Toca had encouraged Titlow to withdraw her plea, such advice did not fall below an objective standard of reasonableness.

The primary error in the majority's opinion lies in its basic premise—that Titlow chose to withdraw her plea because of Toca's advice. Even if Toca's performance was deficient, which in my view it was not, the record does not establish that Toca's advice was the decisive factor in Titlow's decision to withdraw her plea. "A defendant challenging his attorney's conduct during plea bargaining must . . . . show that his lawyer's deficiency was a decisive factor in his decision to plead." *Short v. United States*, 471 F.3d 686, 692 (6th Cir. 2006) (internal citation and quotation marks omitted). The record shows that Titlow wanted to withdraw her plea before she ever enlisted Toca as counsel. In fact, her desire to withdraw her plea, in response to Detective Ott's statement that she should not plead guilty if she was not guilty, was the reason she sought new counsel—Toca, as it turned out. More importantly, Titlow has argued throughout her appeals and habeas proceedings that it was Detective Ott's statement that motivated her to change her plea.[1] Titlow has not presented any evidence indicating that

———————

[1] On habeas review, we are not free to choose one side of the facts, but the majority does just that in its description of some of the evidence presented at trial. For example, the record indicates that Detective Ott referred Titlow to his own attorney, Saunders Dorsey, and did not recommend Toca.

Toca advised her to withdraw her plea or that he was otherwise a decisive factor in her decision to go to trial. Instead, the record indicates that she had wanted to change her plea and enlisted Toca as new counsel to do just that.

Even if Toca was the reason Titlow chose to withdraw her plea, the record does not establish that his performance was deficient. The majority conducts a *de novo* review of Toca's performance after determining that the Michigan Court of Appeals based its determination on an unreasonable assessment of the facts. In doing so, the majority misreads the Michigan Court of Appeals's opinion, which states that the record indicates that Toca's advice "was set in motion" by Titlow's assertion of innocence. The majority concludes that this was an unreasonable assessment of the facts because Toca never mentioned Titlow's innocence at the change of plea hearing and instead argued for withdrawal based on the excessiveness of the sentence. However, the Michigan Court of Appeals recognized that the basis for the plea withdrawal was the excessiveness of the sentence, *see Michigan v. Titlow*, No. 241285, 2003 WL 22928815, at *1 (Mich. Ct. App. Dec. 11, 2003), and Toca's statements at the change of plea hearing do not contradict the court's conclusion that his advice stemmed from her assertion of innocence. Instead, the record, and Titlow's own arguments throughout her appeals, support the Michigan court's conclusion because they demonstrate that she chose to obtain new counsel only after she had passed a polygraph test and Detective Ott advised her that she should not plead guilty if she was not guilty. Any advice that Titlow may have received from Toca was the result of Titlow's wanting new counsel and no longer wanting to plead guilty. The fact that at the hearing Toca asserted a separate reason for withdrawing the plea does not undermine this conclusion. Accordingly, the Michigan Court of Appeals did not base its determination on an unreasonable assessment of the facts.

Finally, even under *de novo* review, Titlow has not established that Toca's performance was deficient. First, Toca's decision to move for withdrawal of the plea

---

Likewise, the majority states that the "evidence suggests" Billie smothered Donald when Titlow left the room in spite of the fact that the record contains testimony that Titlow was in the room at the time.

based on either Titlow's claims of innocence or the excessiveness of the sentence was reasonable. It is undoubtedly reasonable for an attorney to recommend that his client reject a plea if the client maintains her innocence, as the record suggests Titlow did. It is just as reasonable for an attorney to advise a client that pleading to an above-guidelines sentence was not in her best interest. The majority concludes that Toca was deficient because he did not investigate Titlow's case file before moving to withdraw her plea. But, there is nothing in the record establishing that the case file would have undermined any advice that Toca may have given Titlow. The state's evidence did not assure a first-degree murder conviction; indeed, the jury convicted Titlow of a lesser-included offense. Even if Toca had reviewed the case file, advising Titlow to withdraw her guilty plea either because she maintained her innocence or because she pleaded to an above-guideline sentence, in my view, does not fall below an objective standard of reasonableness.

Moreover, the time line of events leading to the plea withdrawal sheds some light on Toca's decision not to review the case file. Following her discussion with Detective Ott, Titlow eventually signed a fee agreement with Toca on November 26th. Billie Rogers's trial, in which Titlow agreed to testify as part of her plea, was scheduled to begin on November 29th. If Titlow wanted to withdraw her plea, as the record suggests, then she needed to make a decision before she had to testify in Rogers's trial. So on November 29th, Toca, having represented Titlow for only three days (formally substituting as counsel that day), moved to withdraw Titlow's plea. With such a short time frame, Toca's decision to move to withdraw the plea without reviewing the case file seems reasonable.

Second, Titlow has not overcome the strong presumption that Toca exercised reasonable professional judgment during his representation. *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Although "failure to provide professional guidance to a defendant regarding his sentence exposure prior to a plea may constitute deficient assistance," *Moss v. United States*, 323 F.3d 445, 474 (6th Cir. 2003), there is nothing in the record showing that Toca failed to so advise Titlow. She has not presented any

evidence that she lacked any information when she made the decision to withdraw her plea. Rather, Titlow affirmed at the change of plea hearing that she was aware that withdrawing her plea to manslaughter subjected her to a potential life sentence for first-degree murder. The burden is on the defendant to present evidence establishing that counsel was ineffective, and the defendant's chance of success does not rest on the government's or counsel's ability to refute the claim of ineffectiveness, as the majority suggests. *See Strickland*, 466 U.S. at 687; *Short*, 471 F.3d at 692 ("[D]efendants alleging ineffective assistance of counsel bear a heavy burden of proof." (internal quotation marks omitted)). Titlow has simply not presented any evidence that Toca gave her deficient advice. Instead, she argues that Toca's motion to withdraw the plea was a "reckless roll of the dice." But "[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Although Toca did not pick up the file before moving for the plea withdrawal, Titlow has not explained how the file would have undermined the reasonableness of the plea withdrawal and, therefore, has not overcome the strong presumption of reasonableness.

The majority cites *Lafler v. Cooper*, 132 S. Ct. 1376 (2012), as a case involving a "similar constitutional violation" without recognizing the crucial distinction between that case and this one—that the petitioner in *Lafler* presented actual evidence that he received deficient advice. Specifically, both the petitioner and his former counsel testified at a *Michigan v. Ginther*, 212 N.W.2d 922 (1973), hearing, and their testimonies established that counsel had informed the petitioner of an incorrect legal rule that caused the petitioner to reject a plea offer. Titlow has not presented any similar evidence, as she did not have a *Ginther* hearing. Unlike *Lafler*, this case offers absolutely no evidence from which we can discern that Titlow received deficient advice. As the majority recognizes, "the record contains no details about Toca's conversations with Titlow" before the change of plea hearing. Without evidence that Toca gave incorrect advice or evidence that he failed to give material advice, Titlow cannot establish that his performance was deficient.

Although I would not reach the *Lafler* question because I do not believe that Titlow has established that her counsel was deficient, I cannot agree with the majority's description of *Lafler*'s requirements of the trial court during its reconsideration of the plea offer. *Lafler* does not, as the majority states, *require* the trial court to consult the plea agreement; it simply says that the "baseline" of the original plea offer "can be consulted in finding a remedy." *Lafler*, 132 S. Ct. at 1389. *Lafler* also does not require the trial court to resentence Titlow. Instead, *Lafler* states that once the prosecution reoffers the plea proposal, "the judge can then exercise discretion in deciding whether to vacate the conviction from trial and accept the plea or leave the conviction undisturbed." *Id.* Moreover, it is not the trial court's responsibility, as the majority states, to "fashion a sentence for Titlow that . . . remedies the violation of her constitutional right," as the remedy for the violation is the government's reoffering of the original plea agreement. *See id.* ("In these circumstances, the proper exercise of discretion to remedy the constitutional injury may be to require the prosecution to reoffer the plea proposal . . . ."). *Lafler* does not impose such requirements on the trial court, and the majority's statements to the contrary are incorrect.

The record does not establish that Toca was the reason Titlow withdrew her plea. Nor does it establish that his performance fell below an objective standard of reasonableness. Accordingly, the Michigan Court of Appeals's denial of Titlow's ineffective assistance claim was reasonable and, therefore, I must respectfully dissent.