NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0619n.06

No. 11-6276

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| GARNER DWIGHT PADGETT | ) | **FILED** |
| | ) | Jul 02, 2013 |
| Petitioner-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID SEXTON, Warden | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| Respondent-Appellee. | ) | MIDDLE DISTRICT OF TENNESSEE |
| | ) | |

Before:  GIBBONS and WHITE, Circuit Judges; and COHN, Senior District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.**  Garner Dwight Padgett appeals the denial of

his petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254.  Following a jury trial, Padgett

was convicted of first-degree murder and sentenced to a term of life imprisonment.  Tennessee state

courts affirmed Padgett's conviction on direct appeal and denied him post-conviction relief.  Padgett

argues that he is entitled to *habeas* relief on four grounds: (1) his confession was not knowingly,

intelligently, or voluntarily made; (2) the jury was tainted when two jurors observed him exiting the

courthouse lock-up; (3) the prosecutor made an unsupported accusation during closing argument;

and (4) he was denied the effective assistance of post-conviction counsel.  We affirm the district

court's denial of Padgett's *habeas* petition.

---

[*]The Honorable Avern Cohn, Senior United States District Judge for the Eastern District of
Michigan, sitting by designation.

**I.**

In March 2001, the body of Matthew Eric Smith was found in a remote wooded area in Putnam County, Tennessee. Investigators interviewed Padgett regarding Smith's death on March 24 and 27. During the second interview, Padgett confessed to shooting and killing Smith, who was having an affair with Padgett's wife. Padgett was charged with first-degree murder.

**A.**

Padgett filed a pre-trial motion to suppress his statements and any evidence derived as a result of them, arguing that he was incapable of knowingly, intelligently, and voluntarily waiving his *Miranda* rights due to his below-normal intelligence level, bipolar disorder, and substance abuse issues. The trial court held an evidentiary hearing on May 23, 2002.

The State presented testimony from the investigators who interviewed Padgett, Agent Bob Krofssik of the Tennessee Bureau of Investigation and Detective Jerry Dale Abston of the Putnam County Sheriff's Department. They testified that Padgett received *Miranda* warnings and signed a waiver before each interview. They stated that they did not promise Padgett leniency if he spoke with them or threaten him if he did not cooperate. They also testified that, during each interview, they permitted Padgett to take cigarette and drink breaks.

On March 24, 2001, the investigators interviewed Padgett after he was arrested on a theft charge. They testified that Padgett said he had been drinking that day but claimed that he was sober at the time he spoke with them. Abston testified that Padgett told them he was bipolar but denied needing treatment. The investigators claimed that Padgett "looked fine" and appeared "normal," not

"fearful or scared or nervous in any way." They interviewed Padgett from 10:47 p.m. to 1:37 a.m., and Krofssik took a statement from Padgett, which Padgett reviewed and signed.

On March 27, the investigators interviewed Padgett while he was in custody. Abston testified that Padgett did not exhibit symptoms of withdrawal from drugs or appear to be in need of medication. Krofssik said that Padgett informed him that he was not taking prescribed medication, but that this did not affect his understanding of their conversation. The investigators interviewed Padgett from 8:32 p.m. to 10:28 p.m. Krofssik took a statement from Padgett, which Padgett signed. The investigators testified that after an hour-long break, Padgett said that he wanted to make another statement. They started interviewing Padgett at 11:38 p.m. At about 12:30 or 1:00 a.m., Padgett confessed to killing Smith. Krofssik questioned Padgett and crafted his answers into a statement, which Padgett signed. The interview ended at 4:55 a.m.

At the evidentiary hearing, the defense presented Dr. Eric S. Engum, who testified that Padgett suffers from bipolar disorder, with a history of alcohol and polysubstance dependence. He said that at the time that investigators interviewed Padgett, he suffered from bipolar disorder, "was drinking in excess virtually on a daily basis," and "was going through alcohol withdrawal," conditions that Engum said were exacerbated by sleep deprivation on the night of his confession. Engum concluded that Padgett's conditions "would seriously raise a question in [his] mind as to whether [Padgett] was able to make a voluntary waiver."

Padgett also testified as to his history of mental illness, drug, and alcohol abuse. He said that on March 24, he drank a gallon of whiskey and used methamphetamine. He claimed that he did not remember speaking with Krofssik and Abston on that date. Padgett testified that he "[s]omewhat"

remembered speaking to investigators on March 27 but that he was in "[t]errible shape" and "was seeing snakes in my walls and spiders coming out of my drain." Padgett said that when he was smoking cigarettes with investigators in a stairwell, Krofssik remarked that "[i]t was a long ways down" the stairs, which Padgett interpreted as a threat to "throw [him] down the stairway." Padgett said that the statements taken by Kroffsik were incorrect, but he signed them because he was scared.

The trial court credited the investigators' testimony over Padgett's, noting that Padgett appeared to have "some selective loss of memory." It denied Padgett's suppression motion, reasoning:

> I suppose we are dealing with a question of the voluntariness of a confession and the totality of circumstances is the standard. Under the circumstances of how the statement was allegedly made on the 27th, there would be nothing to indicate from the testimony of Mr. Padgett or from the testimony of the officers that something transpired that would over bear the will of the accused in this case in some sort of a threatening way.
> . . . .
> I don't think anybody can dispute the diagnosis. I certainly can't. I'm not in any way qualified to make any sort of diagnosis of anybody's mental condition. But that in itself does not render any statement given to be involuntary or any waiver to be unknowing.
>
> And all the proof here that I've heard this morning would indicate that the defendant understood his rights. He waived his rights. And he gave a statement and signed off on those rights. He says he didn't read them. They didn't read them to him. They say they did.
>
> And from the totality, as we use the term, the circumstances would indicate to me that there was a voluntary and knowing waiver of the rights and a voluntary statement given. So I would deny your motion to suppress.

On October 1, 2002, Padgett's case proceeded to trial. At trial, Padgett's March 27 confession was read to the jury. Ralph Bryant, with whom Padgett worked on a construction project,

4

and Connie Bryant, Ralph's wife, testified that Padgett told them weeks before Smith's death that

he planned to kill Smith. The State also introduced a .22-caliber Browning automatic pistol that was

found in the area where Padgett told investigators that he had disposed of the weapon. Steve Golden

identified the pistol as his gun, which Padgett told investigators that he had stolen from Golden

weeks before the shooting. The defense did not offer any testimony at trial.

**B.**

On the first full day of trial, jurors observed Padgett being transported from the courthouse

lock-up. A juror asked Orbie Goff, a courthouse employee, what was behind a door. Goff opened

the door and allowed three jurors to step inside the holding cell area. Goff explained that prisoners

took an elevator from the courthouse jail up to the holding cell area. While two of the jurors were

exiting the holding cell area, Bo Sherrill, a corrections officer, brought Padgett up on the elevator.

Juror Dora Simpson turned and saw him. Sherrill closed the door when he recognized the juror and

later estimated that the door was open for "[n]o more than ten seconds." Juror James Simmons also

said that he saw Padgett. Simpson and Simmons admitted that they discussed the incident with other

jurors.

Padgett's counsel moved for a mistrial. The trial court denied the motion but said that it

would issue a curative instruction. Padgett's counsel opposed the instruction, arguing that it would

draw more attention to the fact that Padgett was incarcerated. The trial court instructed the jury:

> Let me ask the jury in regards to some matters that have come up during the lunch
> break. There was occasion to what we refer to as the holding cell area was opened
> and one or two jurors then had stepped in just to observe the layout of the building
> and unaware that the accused might be in there and there was some observation made
> by a couple of jurors at least saying that they observed the accused. And I'm going

to ask you to disregard. I must say that it everybody and then maybe you all know it now, but if you don't, I guess I'm telling you now and then I'm asking you to disregard it. And certainly it's not unusual in a criminal case and it is customary for a person once they are accused of a crime to be arrested and placed under bond and await trial. People make bonds; people don't make bonds depending on a lot of things. The bond was set and the accused in this case, Mr. Padgett, was brought up from the lock-up area and you should place no significance of the fact that he is incarcerated at this time. As I said, it's not unusual for a person to be incarcerated until trial. And so I would instruct you to disregard the fact that I have now said this and certainly don't let that in any way influence your verdict in this case. This case should be decided based upon the facts that were presented from the witness stand. And so if you have made the personal observation or now that you've told about it, you should not give that any thought or consideration in your verdict.

## C.

During closing argument, the prosecutor described how Padgett allegedly drove Smith to a remote wooded area and shot him. He said:

> You know, I can't—I'm looking at that scene and I'm looking at those pictures which you'll see in the jury room and I can't think of a better place to kill somebody. It's ten miles from nowhere, out in the boonies, and then almost 100 yards, almost 300 feet down a dirt road where there's no chance of being seen. There's no chance of having witnesses. I can't think of a better place in the whole wide world to take somebody to kill them if that's what your purpose is.

> Not a good place to hide your dope. People hide dope off of their property but close to their home. They don't have to drive.

> And isn't it interesting too who was doing the driving? The defendant was driving the truck that night and his victim was in the passenger seat. And I suggest to you that you can assume that the defendant was in there at gunpoint being driven to—

Padgett's counsel objected, arguing that the statement "the defendant was in there at gunpoint" was unsupported by evidence.[1] The trial court asked the jurors to disregard the remark, instructing them to "draw conclusions from the proof that you've heard."

The jury found Padgett guilty of first-degree murder, and the trial court sentenced Padgett to life imprisonment.

**D.**

The Tennessee Court of Criminal Appeals affirmed Padgett's conviction on October 21, 2004. It held that the evidence did not preponderate against the trial court's holding that Padgett's statements were knowing, intelligent, and voluntary and, therefore, Padgett's confession was properly admitted. It also held that the trial court did not abuse its discretion by refusing to grant a mistrial after jurors observed Padgett in custody because "there is a presumption that the jurors followed the instructions of the trial court and because the record does not establish that the defendant was unduly prejudiced." The Court of Criminal Appeals noted that the prosecutor's remark during closing argument was improper but nonetheless held that a new trial was not warranted because the trial court immediately corrected the error and there was no evidence that the prosecutor deliberately attempted to prejudice the defendant. The Tennessee Supreme Court denied Padgett's application for permission to appeal on February 28, 2005.

Padgett filed a *pro se* petition for post-conviction relief in the trial court, raising several claims, including ineffective assistance of counsel. The trial court appointed counsel for Padgett and

---

[1] The trial court and the Tennessee Court of Appeals interpreted the prosecutor to mean that Padgett held Smith at gunpoint.

held an evidentiary hearing. At the hearing, Padgett's attorney presented Padgett as a witness and asked him to explain his claims but introduced no other evidence. The trial court denied Padgett's petition on October 17, 2008. The Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief on June 22, 2010. The Tennessee Supreme Court rejected Padgett's application for permission to appeal on October 18, 2010.

On April 5, 2011, Padgett filed a *pro se* petition for a writ of *habeas corpus* in the district court. The district court denied Padgett's petition on October 11, 2011. Padgett appealed on October 19, 2011. This court granted a certificate of appealability as to all issues raised in Padgett's petition.

## II.

In an appeal of a § 2254 *habeas* action, we review the district court's legal conclusions *de novo*. *Cristini v. McKee*, 526 F.3d 888, 897 (6th Cir. 2008). "[W]here the district court has made factual determinations based on its review of trial transcripts and other court records," we review the district court's factual conclusions *de novo*. *Dando v. Yukins*, 461 F.3d 791, 796 (6th Cir. 2006) (internal quotation marks omitted).

Because Padgett's petition was filed after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEDPA governs this court's review. Under § 2254(d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

8

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meaning. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court's decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent." *Id.* at 405-06. A state court's decision is an "unreasonable application" of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08. "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "The state court's application of clearly established law must be objectively unreasonable." *Id.*

The phrase "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. In order to determine whether a legal principle has been clearly established, this court may look to Courts of Appeals' decisions "to the extent they illuminate the analysis of Supreme Court holdings." *Goodell v. Williams*, 643 F.3d 490, 496 (6th Cir. 2011).

9

Finally, a state court's determination of factual issues "shall be presumed to be correct" unless the petitioner rebuts this presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see, e.g.*, *Robinson v. Howes*, 663 F.3d 819, 825 (6th Cir. 2011). This court reviews the decision of "the last state court to issue a reasoned opinion on the issue[s]" raised in a *habeas* petition. *Joseph v. Coyle*, 469 F.3d 441, 450 (6th Cir. 2006). In this case, we review the decision of the Tennessee Court of Criminal Appeals on direct review.

## A.

First, Padgett argues that the Court of Criminal Appeals unreasonably applied clearly established federal law when it concluded that the State carried its burden of establishing that he validly waived his *Miranda* rights.

The Fifth Amendment, which applies to the states by virtue of the Fourteenth Amendment, *Malloy v. Hogan*, 378 U.S. 1, 6 (1964), guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court "established certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation." *Duckworth v. Eagan*, 492 U.S. 195, 201 (1989). A suspect must be told "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. A suspect "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id.*

A court's inquiry into the validity of a waiver "has two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Id.* "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). The totality of the circumstances inquiry requires a court to examine "all the circumstances surrounding the interrogation," including the suspect's "age, experience, education, background, and intelligence, and [] whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Michael C.*, 442 U.S. at 725. The State must prove waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

Padgett argues that the defense witnesses supplied the only evidence of the totality-of-the-circumstances factors mentioned in *Michael C.*—Padgett's age, experience, education, background and intelligence. Padgett contends that because the State offered no expert testimony to contradict Engum's opinion, the Court of Criminal Appeals unreasonably concluded that the State met its burden of establishing a valid *Miranda* waiver. However, as *Michael C.* explicitly states, the list of factors in the opinion is not exclusive. *Michael C.*, 442 U.S. at 725. Courts must examine all relevant circumstances surrounding an interrogation to determine whether a *Miranda* waiver is valid.

11

*Id.* The State presented ample evidence of Padgett's physical and mental state on the nights that he was questioned and of the conditions in which he was interrogated. Krofssik and Abston testified that on March 24 and 27, Padgett was coherent and did not appear to be suffering from the ill effects of his mental illness or substance abuse. They also testified that they did not attempt to coerce Padgett by bribing or threatening him and that they permitted Padgett to take several breaks during questioning. Based on this evidence, the Court of Criminal Appeals reasonably concluded that Padgett validly waived his *Miranda* rights.

Padgett contends that federal circuit courts regularly conclude that "evidence of mental illness, supported by expert testimony" may establish that *Miranda* rights were not knowingly and intelligently waived. However, the only relevant question for purposes of *habeas* review is whether the Court of Criminal Appeals's decision unreasonably applied clearly established federal law—that is, the holdings of the Supreme Court. *See Williams*, 529 U.S. at 412.

A suspect need not "know and understand every possible consequence of a waiver of the Fifth Amendment privilege" in order for his waiver to be knowing and intelligent. *Colorado v. Spring*, 479 U.S. 564, 574 (1987). He need only know "that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.* "[M]ental capacity is one of many factors to be considered" in determining whether a *Miranda* waiver was knowing and intelligent, but "diminished mental capacity alone" does not prevent a defendant from validly waiving his *Miranda* rights. *Garner v. Mitchell*, 557 F.3d 257, 264 (6th Cir. 2009) (*en banc*) (holding that *habeas* relief was properly denied because the petitioner validly waived his *Miranda* rights, notwithstanding expert testimony that he could not have sufficiently

understood the scope of *Miranda*'s protections). In order to determine whether waiver was knowing and intelligent, "our primary focus must remain on what the interrogating officers could have concluded about [the defendant's] ability to understand the warnings, [but] we may consider later-developed evidence of a defendant's actual mental ability to understand the warnings at the time of the interrogation." *Id.* at 263.

In this case, Krofssik and Abston testified that at the time they interrogated Padgett, he appeared to be coherent and was not displaying noticeable effects of his mental illness. They claimed that Padgett told them about his bipolar disorder but denied needing treatment. The investigators' testimony that Padgett "looked fine" and appeared "normal" on the nights that he was questioned is not undermined by Engum's testimony that Padgett suffers from biopolar disorder. The trial court did not dispute Padgett's diagnosis but nonetheless found that Padgett understood his rights at the time that he waived him. The Court of Criminal Appeals held that the evidence did not preponderate against the trial court's decision. The Court of Criminal Appeals did not unreasonably apply clearly established federal law in determining that Padgett knowingly and intelligently waived his *Miranda* rights.

**B.**

Padgett next argues that the Court of Criminal Appeals's conclusion that a mistrial was not warranted because jurors saw Padgett in custody is contrary to or an unreasonable application of clearly established federal law.

"The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment." *Estelle v. Williams*, 425 U.S. 501, 503 (1976). "The presumption of innocence, although not

articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Id.* As a result, "courts must be alert to factors that may undermine the fairness of the fact-finding process." *Id.* A defendant "'is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'" *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986) (quoting *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978)).

The Supreme Court has considered whether particular courtroom policies pose such a threat to the fairness of the fact-finding process that they violate a defendant's right to a fair trial. *See Holbrook*, 475 U.S. at 568-69, 571 (holding that the use of identifiable security personnel in a courtroom during trial is not inherently prejudicial and that, on the facts of that case, there was no unacceptable risk of prejudice); *Estelle*, 425 U.S. at 504-05, 512 (holding that it is unconstitutional for a state to compel a defendant to stand trial before a jury while dressed in prison clothes because this "furthers no essential state policy" and presents an unacceptable risk of affecting jurors' judgment); *Illinois v. Allen*, 397 U.S. 337, 344 (1970) (observing that shackling and gagging a defendant during trial "might have a significant effect on the jury's feelings about the defendant" but noting that this may be permissible in the case of a disorderly defendant).[2]

---

[2] Padgett cites *Deck v. Missouri*, which held that the use of visible shackles during the guilt and penalty phases of trial violates the Constitution "*unless* that use is 'justified by an essential state interest'—such as the interest in courtroom security—specific to the defendant on trial." 544 U.S. 622, 624 (2005) (quoting *Holbrook*, 475 U.S. at 568-69). *Deck* was decided after Padgett's direct appeal and, thus, it was not clearly established federal law at the time the state courts ruled.

The Supreme Court has not determined whether a chance occurrence—specifically, a juror's inadvertent sighting of a defendant being transported by court officials—is so prejudicial that it violates a defendant's right to a fair trial. Thus, the Court of Criminal Appeals's decision cannot be "contrary to" clearly established federal law. *See Williams*, 529 U.S. at 405-06. Moreover, the decision was not an "unreasonable application" of clearly established federal law regarding a defendant's right to a fair trial. On direct review, we have held that a juror's sighting of a defendant being transported is not so prejudicial that it denies the defendant the right to a fair trial. *See United States v. Barger*, 931 F.2d 359, 371 (6th Cir. 1991) (holding that a defendant's right to a fair trial was not violated when a juror saw a co-defendant in shackles one morning before trial); *United States v. Chipman*, 513 F.2d 1262, 1263 (6th Cir. 1975) (*per curiam*) (holding that a defendant's right to a fair trial was not violated when, at the end of a day of trial, the defendant rode in the same elevator as the judge and two jurors while handcuffed and in the custody of a Marshal); *United States v. Crane*, 499 F.2d 1385, 1388-89 (6th Cir. 1974) (holding that a defendant was not prejudiced when jurors saw him handcuffed to a co-defendant as he was led into the courtroom).

The jurors' sighting of Padgett in the holding cell area lasted only a few seconds, and the trial court quickly issued a curative instruction. Padgett argues that the instruction compounded the error because it informed jurors that Padgett was incarcerated but failed to tell them "that it was for innocent reasons." However, the trial court essentially told jurors this when it stated that defendants are commonly jailed while awaiting trial and that they can be held for many reasons, including failure to post bond. More importantly, the trial court directed jurors to assign no significance to the fact that Padgett was incarcerated and to decide the case based on the evidence presented at trial.

15

The Court of Criminal Appeals held that the trial court did not abuse its discretion by refusing to grant a mistrial because "there is a presumption that the jurors followed the instructions of the trial court and because the record does not establish that the defendant was unduly prejudiced." The Court of Criminal Appeals's decision that the jurors' sighting of Padgett was not so prejudicial as to violate Padgett's right to a fair trial was not objectively unreasonable. *See Lockyer*, 538 U.S. at 75.

Finally, Padgett argues that the Court of Criminal Appeals erred by failing to ask whether the alleged constitutional error was harmless beyond a reasonable doubt, as required by *Chapman v. California*, 386 U.S. 18 (1967). The court was not required to ask the *Chapman* question, because it concluded that no constitutional violation occurred. Therefore, the Court of Criminal Appeals did not fail to apply clearly established federal law.

## C.

Padgett contends that the Court of Criminal Appeals's holding that the prosecutor's unsupported remark during closing argument did not deny Padgett a fair trial was contrary to or an unreasonable application of clearly established federal law.

The relevant question in analyzing a claim of prosecutorial misconduct on *habeas* review is whether the prosecutor's comments "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The appropriate standard of review for such a claim is "'the narrow one of due process, and not the broad exercise of supervisory power.'" *Id.* (quoting *Donnelly*, 416 U.S. at 642). "[N]ot every trial error or infirmity which might call for

16

application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental

fairness essential to the very concept of justice.'" *Donnelly*, 416 U.S. at 642 (quoting *Lisenba v.*

*California*, 314 U.S. 219, 236 (1941)).

We employ a two-prong test in order to determine whether a state court reasonably applied

the federal standard for prosecutorial misconduct:

> First, this court determines whether the prosecution's conduct or remarks were improper. If the answer is affirmative, then the court considers four factors to decide whether the improper acts were sufficiently flagrant to warrant reversal: (1) whether the evidence against the defendant was strong, (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally.

*Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006).

Even if the prosecutor's suggestion that Padgett held Smith at gunpoint was improper

because it was unsupported by the evidence, it was not flagrant. The prosecutor made one isolated

comment during closing argument. Defense counsel objected, and the trial court immediately

instructed the jury to disregard the comment, thereby ensuring that the jury would not be misled.

The Court of Criminal Appeals observed that there is no evidence that the prosecutor made his

remark deliberately in order to prejudice Padgett. Padgett argues that he was unfairly prejudiced by

the prosecutor's comment, which was relevant to the contested issue of premeditation. However,

as Padgett concedes, the State introduced other evidence of premeditation, including his confession,

testimony from two witnesses who claimed that Padgett told them about his plans to kill Smith, and

evidence that Padgett procured a gun weeks prior to the killing. In light of the abundance of strong

evidence against Padgett, it is unlikely that the prosecutor's comment prejudiced Padgett.

The Court of Criminal Appeals's holding that the prosecutor's comment did not deny Padgett a fair trial was not contrary to or an unreasonable application of clearly established federal law. Padgett repeats his argument that the court was required to ask whether this alleged constitutional error was harmless beyond a reasonable doubt, as required by *Chapman*. Once again, because the court determined that no constitutional error occurred, it was not required to ask this question.

**D.**

Finally, Padgett argues that his appointed state post-conviction counsel was ineffective. Padgett concedes that he is not entitled to *habeas* relief on this ground. *See Coleman v. Thompson*, 501 U.S. 722, 752 (1991) (holding that there is no constitutional right to an attorney in state post-conviction proceedings and, thus, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings). He nonetheless argues that his case illustrates why petitioners should be entitled to bring such claims. He contends that he raised the claim that his trial counsel was ineffective for the first time in state post-conviction proceedings, but because his post-conviction counsel was ineffective, this claim was not properly developed. Padgett now complains that his ineffective assistance of trial counsel claim "will be forever lost."[3] Even if we sympathized with Padgett, we are not free to recognize his claim, which is barred by *Coleman*. *See Csekinek v. I.N.S.*,

---

[3]Padgett concedes that he is not entitled to relief under *Martinez v. Ryan*, 132 S. Ct. 1309, 1319-20 (2012) (holding that inadequate assistance of counsel during initial-review collateral proceedings may establish cause for procedural default of a claim of ineffective assistance at trial where the initial-review collateral proceeding is the first proceeding in which the prisoner can raise his claim of ineffective assistance at trial).

18

391 F.3d 819, 824 (6th Cir. 2004) ("A precedent of the Supreme Court must be followed by the

lower federal courts.") (internal quotation marks and alterations omitted).

## III.

For these reasons, we affirm the district court's denial of Padgett's *habeas* petition.