NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0283n.06

No. 12-6339

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Apr 15, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| TYREESE HALL, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF KENTUCKY |
| GARY BECKSTROM, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |

BEFORE:  CLAY and ROGERS, Circuit Judges; and LUDINGTON, District Judge.[*]

**LUDINGTON, District Judge**.  Tyreese Hall and his uncle beat a homeless man so viciously that the man fell into a coma and died 53 days later.  As a result, Hall and his uncle were jointly tried and convicted of murder, first-degree robbery, and first-degree sodomy.  After the Kentucky Supreme Court denied Hall's direct appeal, he filed a petition for a writ of habeas corpus in the Western District of Kentucky.  When the district court denied that petition, Hall filed this appeal.  After review, the district court's decision is **AFFIRMED**.

**I**

**A**

In the early morning hours of April 6, 2004, Hall was walking through the streets of Louisville, Kentucky, with Derek Edmonds, his 37-year-old uncle, and Dewayne Edmonds, Derek's brother.  Hall, only 19 years old at the time, has an IQ of 65; the trial court would later find him to

---

[*]The Honorable Thomas L. Ludington, United States District Judge for the Eastern District of Michigan, sitting by designation.

be "seriously mentally retarded."[1] *Edmonds v. Commonwealth*, No. 2007-SC-000350-MR, 2009 WL 4263142, at *12 (Ky. Nov. 25, 2009).

As the men walked into an alley, Derek discussed the possibility of robbing someone for drug money because he was looking for crack. Just then, they chanced upon Clifton Agnew. Agnew was homeless, and he had spent the night sleeping in the alley behind some trashcans. When Agnew heard the men coming, he got to his feet. Hall thought he saw Agnew reach for something, so he punched Agnew in the face and knocked him to the ground. While Agnew was down, Hall and Derek kicked him in the side and in the head. Then Hall walked away to the end of the alley, but for some reason he came back. He grabbed a ceramic crockpot from a nearby dumpster and smashed it against Agnew's legs. He also stabbed Agnew's leg with a pocketknife and tossed the knife aside.

Meanwhile, Dewayne picked up Agnew's wallet and, finding it empty, threw it down and walked out of the alley.[2] Hall did not see Dewayne again that night. After Dewayne left, Derek continued to beat Agnew. He kicked Agnew in the face over and over. Hall testified that he was scared, told Derek to stop beating Agnew, and again walked away to the far end of the alley. Derek would not stop, however, even when Hall returned and pleaded with him. Hall claims he continuously asked Derek to stop hurting Agnew but was afraid to physically interfere with the larger, stronger, older man. Eventually, Agnew lost consciousness and stopped screaming. Hall then walked down to the far end of the alley for a third time.

---

[1] "[T]he trial court entered an order finding that Hall was a seriously mentally retarded defendant as defined by KRS 532.140 and . . . meets the criteria for a retarded person under *Atkins v. Virginia*, and that he was excluded from the death penalty." *Edmonds v. Commonwealth*, No. 2007-SC-000350-MR, 2009 WL 4263142, at *12 (Ky. Nov. 25, 2009) (internal quotation marks omitted). Kentucky Revised Statute § 532.140 provides that "no offender who has been determined to be an offender with a serious intellectual disability . . . shall be subject to execution." Ky. Rev. Stat. § 532.140(1).

[2] Hall gave conflicting accounts concerning whether Dewayne also punched and kicked Agnew before leaving the alley.

When Hall returned this time, he saw that Derek had dragged Agnew through a hole in a nearby fence and pulled Agnew's pants down. Derek announced, "I'm going to do him like they did our people back in the day," which Hall claimed referred "to racial stuff."[3] *Edmonds*, 2009 WL 4263142, at *1. Derek then raised a two-and-a-half foot stick and stabbed it into Agnew's rectum with such force that the stick penetrated Agnew's organs up into his left lung. Derek then sodomized Agnew with the stick for approximately two minutes, withdrew it, and dropped it to the ground. Derek repeated the process with a shorter stick and a beer bottle.

Louisville Metro Police Officers Joe Heitzman and Tim Thomas were patrolling the area near the alley just before 4:00 a.m. When they saw two individuals in the alley, the officers brought their police cruiser around to investigate. As the officers watched, Hall ran toward a nearby Salvation Army building and disappeared before they moved to apprehend him.[4] When the officers reached the alley, they found Agnew unconscious, bleeding profusely from his rectum and head. Agnew was rushed to the University of Louisville Hospital. Treating physicians confirmed that he had suffered significant intra-abdominal injuries and was losing a large amount of blood. They were able to stabilize him, but Agnew remained comatose for 53 days until he died due to head trauma compounded by substantial blood loss to his brain.

After the officers radioed for help and as they began to identify potential evidence, Derek walked up and asked them what was happening. The officers ordered him to depart, and then discovered a 27-inch stick, a 15-inch stick, and a beer bottle—all bloody and broken—as well as large, bloody pieces of a crockpot in the alley. Other Louisville police officers arrested Derek

---

[3] Both Hall and Derek are African Americans, and Agnew was Caucasian.

[4] Hall actually entered the Salvation Army shelter, which is where he was staying at the time. *See* Apr. 6 Interview Tr. 7.

around 4:00 a.m. the morning of the crime on charges of alcohol intoxication and disorderly conduct, but he was released because he had yet to be implicated in Agnew's beating.

**B**

Another homeless man, Larry Milligan, witnessed the events in the alley. He claimed to have seen and heard Agnew's beating through the open window of a nearby house. At approximately 7:00 a.m. on April 6, Milligan provided a taped statement to Louisville Metro Police Department (LMPD) Detective Jeff Wheeler describing the attack. According to Milligan, only two individuals were involved with beating Agnew in the alley. Milligan then identified Hall from a photo pack display as one of those individuals. Report & Rec. (R&R) 16, *Hall v. Beckstrom*, No. 11-00404 (W.D. Ky. July 16, 2012). After providing this information, Milligan disappeared. Despite the prosecution and defense attorneys' efforts to locate him so that he could testify at trial, Milligan was never found.

**C**

Law enforcement apprehended Hall around 9:00 a.m. the day of the beating. About an hour later, Detective Gary Williamson of LMPD's Homicide Unit interviewed Hall. Before the interview began, Hall was given a *Miranda* waiver form. He placed his initials next to each of the following lines under the heading "Your Rights":

Before we ask you any questions you must understand your rights.

1.) You have the right to remain silent. TH

2.) Anything you say can and will be used against you in a Court of Law. TH

3.) You have the right to talk to a lawyer prior to any questioning or the making of any statements, and to have him present with you while you are being questioned. TH

4.) If you cannot afford to hire a lawyer, one will be appointed by the Court to represent you before any questioning, if you desire one. TH

5.)    You may stop the questioning or making of any statement at any time by refusing to answer further or by requesting to consent with a lawyer prior to continuing with the questioning or the making of any statements.  TH

Apr. 6, 2004 Interview Tr. 1, *attached as* Def.'s Resp. Ex. 3, *Hall v. Beckstrom*, No. 11-00404 (W.D. Ky. Nov. 2, 2011).  Hall also signed and dated this waiver of rights:

I have read this statement of my rights or have had it read to me and I understand what my rights are.  I am willing to make a statement and answer questions.  I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me and no pressure of coercion of any kind has been used against me.

*Id.*

Before Detective Williamson began asking questions related to the incident in the alley, he first discussed Hall's educational background:

Williamson:    Tyreese, I'm Gary Williamson.

Hall:          (Inaudible).

Williamson:    I appreciate you coming in here.  Oh… buddy, I'll give you something here real quick and um… Tyreese, what year of school did you go to?

Hall:          Late… the last year of the plea.

Williamson:    Did you go to the 12th grade?

Hall:          I'm trying to think.  Yea, it was the last that I had…

Williamson:    Eleventh grade.  So you can read and write?

Hall:          I (inaudible) happen all of this though.

Williamson:    I don't mean to insult you but it's something I gotta ask.

*Id.* at 2.  Although Hall attended school through eleventh grade, he can only read at a second-grade level.  *Edmonds*, 2009 WL 4263142, at *13.

Detective Williamson then addressed Hall's waiver of rights:

Williamson: O.K. Tyreese, I want you to read this real quick and just initial out by side each one as you read it.

Hall: Yes, sir.

Williamson: O.K. And then read this bottom part. Tyreese, you understand that?

Hall: Uh-huh.

Williamson: O.K. And then you put your signature right there. That's okay; you can just go ahead and scratch it out. O.K. I'll witness it. It's now... you understand those rights?

Hall: Yes, sir.

Apr. 6, 2004 Interview Tr. 2–3.

At first, Hall said that he had no idea why he was in the police station. *Id*. at 7. Then, he indicated differently:

Hall: Well last night, um… it was, I don't know how it all happened but it was only supposed to be—it was supposed to been our… I'm not on, you know, saying nobody else's names as with me.

Williamson: You don't have to.

Hall: Then uh, it was supposed to be just getting some money off somebody. And whatever, everything happened after that, I don't know.

Williamson: O.K.

Hall: All right, honestly, sir, I did—I hit the guy, I swung my hand. I hit him one time.

*Id*. at 9. When Detective Williamson asked where this occurred, Hall responded: "At the Salvation Army in the alley, sir." *Id*. Hall claimed that after hitting the man (Agnew), "we went through his pockets and his wallet; then I left. And then after that I don't know what had happened, with anything else." *Id*. at 11. Hall admitted that he hit Agnew with a crockpot. *Id*. at 14–15. As he continued speaking, Hall acknowledged that he was "scared shitless." *Id*. at 17.

Hall explained that, after he hit Agnew with the crockpot, Agnew said " 'I ain't got no money,' and all of a sudden like 'I ain't got no money'—he kept doing it like that." *Id*. at 21 (internal quotation marks added). Hall also confirmed that "Derek was there the whole time." *Id*. Hall then admitted that—along with striking Agnew with fist and crockpot—he kicked Agnew in the side and in the head because Derek was doing it. *Id*. at 27–28.

At that point, Detective Williamson said it was time to "get to the worse [sic] part, okay? You know what that is?" *Id*. at 30. Despite initial reluctance, Hall eventually admitted to being present and observing Derek sodomize Agnew:

Hall: No, sir.

Williamson: Tyreese, you don't know what the worst part of this whole thing was? Let me explain something else to you. There's gonna be prints on all that stuff, I mean, when something goes bad, you don't… you're not thinking, okay. And those prints are gonna show who did it. Now you can take your part of this like a man now and get it out of the way or you can go forth… back and forth between you and Derek. All right.

Hall: Yes, sir.

Williamson: And I'm sure you both have a part in it. O.K. Now do you know what I'm talking about? Tyreese…?

Hall: No, I'm… seriously, I really don't.

Williamson: Don't—don't lie to me now, I mean, we've gotten this far, it's no worse than what—than what you've already done.

Hall: I don't know exactly.

Williamson: You know what I'm talking about. I'm not even gonna say it. I want you to tell me. I want you to come forward and be a man about it. Now what's the worst part of this whole deal tonight? What's bothering you the most? What—what made Tyreese be so nervous about this?

Hall: Please don't tell me he died.

Williamson: No, he's not dead. He's not dead. Thank God! That's why you better get ahead of this now.

Hall: Yes, sir.

Williamson: He's not dead. Now what's the worst part of this whole deal tonight? What is bothering Tyreese more than any part of this whole thing? What… that was so bad? And you know I'm gonna prove it.

Hall: I didn't touch him. I know what you're talking about, man, but I didn't do that. I didn't have nothing to do…

Williamson: Well, what am I talking about?

Hall: Stuff and—and sticks on him… shoved up his rear and everything.

*Id*. at 30–31. Although Hall claimed he never touched the sticks, *id*. at 36, he did establish "there was a long one, a real long one, then a short one, and that's the only two-(2) I really know of," *id*. at 37. Hall said he never saw the bottle. *Id*. at 38.

Detective Williamson asked Hall to return to the beginning and explain "exactly what happened." *Id*. at 41. Hall indicated that sometime between 3:00 and 4:00 a.m., he and Derek were "[j]ust walking around" because Derek was looking for crack cocaine. *Id*. at 41, 42. He recounted how they came upon Agnew, how he hit Agnew and knocked him over, and that he then walked away. *Id*. at 43. Hall indicated that he came back, hit Agnew with the crock pot, and walked away again. *Id*. When he returned, Derek "had drug [Agnew] (inaudible), he drug him up in there and that's when I had seen the sticks. He had a long stick and a short stick and he shoved 'em." *Id*. Agnew was unconscious for these events. *Id*. at 44. Hall indicated that he went back to the Salvation Army shelter where he was staying, but was unable to fall asleep. *Id*. at 46.

The interview then turned to the knife that was recovered from the alley. Detective Williamson asked Hall if his fingerprints would be on the pocketknife found at the scene. *Id*. at 47. Hall admitted that he had stabbed Agnew in the leg with Derek's knife and then tossed the knife

away. *Id*. at 48. Detective Williamson ended the interview and went to get Hall a Coke and a bag of chips. *Id*. at 53–54.

Later that day, police officers arrested Derek a second time based on Hall's interview. The police took Derek to the LMPD homicide office where he provided a videotaped statement disclaiming any involvement with the robbery and assault of Agnew. Subsequent laboratory testing revealed Agnew's blood on Derek's pants and boots and on Hall's pants. Dawn Katz, a lab technician, testified that Hall's pants revealed a limited number of blood splatters, while Derek's pants and boots were "soaked with blood."

**D**

According to Hall, following their arrests, Derek repeatedly pressured him to "take the case," in other words, claim that he alone was responsible for Agnew's beating. As a result, Hall wrote a notarized statement in which he essentially accepted sole responsibility for the crimes that were committed against Agnew.[5] *See* R&R 15, *Hall v. Beckstrom*, No. 11-00404 (W.D. Ky. July 16, 2012).

Despite the notarized letter exonerating the Edmonds brothers, Hall placed a call to Detective Williamson from custody on July 20, 2004. Hall indicated that there were "a few things" he had not told Detective Williamson at first that he "needed to tell." July 20, 2004 Interview Tr. 56, *attached as* Def.'s Resp. Ex. 3, *Hall v. Beckstrom*, No. 11-00404 (W.D. Ky. Nov. 2, 2011). Hall indicated that he had thought about it and could not "take the fall for all this." *Id*. Detective Williamson questioned Hall concerning whether he wished to waive his rights and divulge further information:

> Williamson: O.K. And um, you know, when I originally brought you in, I advised you of your Rights. Do you remember that?

---

[5] Apparently Hall signed a second notarized letter on June 23, 2005. That letter indicated only that Dewayne Edmonds was not involved in the crimes against Agnew.

Hall:          Yes, sir.

Williamson:    And you're waiving those Rights and the right to an attorney,
               and you've been arraigned on this assault charge; right?

Hall:          Yes, sir.

Williamson:    O.K.  And you know that there's an indictment for murder
               coming or I'm going to attempt to get an indictment for murder;
               right?

Hall:          Yes, sir.

Williamson:    O.K.  So you're… you want to tell me the rest of this?

Hall:          Yes, sir.

Williamson:    O.K.  Um, so at this time you want to waive your right to
               counsel and talk to me about it?

Hall:          Yes, sir.

*Id*. at 57–58.

Hall then revealed Dewayne's involvement in the events of April 6, 2004.  Although Hall made clear that Dewayne was only there while Agnew was kicked and punched in the alley, "the first part of it," *id*. at 59, he indicated that Dewayne "was kicking and hitting [Agnew], too," *id*. at 65. According to Hall, Dewayne also "grabbed the man's wallet."  *Id*.  Hall emphasized that although both he and Dewayne had kicked and punched Agnew, Derek had meted out the most violence.  Hall confirmed that he saw Derek "take and pull this man's pants down and sticking sticks and bottles up in the man's butt." *Id*. at 59.

**E**

During Agnew's extended hospitalization and stay at a nursing home (where he eventually died), Kaye Thomas, a local woman, visited him daily.  Thomas, who had not known Agnew before

the attack, went to the hospital on April 6, 2004, after hearing a news report concerning Agnew's assault. She continued to visit him every day for 53 days—each day until his death.

After her first visit, Thomas started an online campaign to raise awareness and solicit well-wishes for Agnew. Over the course of the following two months, Agnew received thousands of cards. Seventy-five cards arrived the day after Thomas began the campaign, and then 120 the next day, and so on. On one occasion, Agnew received 666 cards in a single day, so Thomas bought him an extra card because she was wary of the number's affiliation with evil. Thomas's initial e-mail "was forwarded from her friends to their friends until [Agnew] had received thousands of cards from all over the world . . . ." *Edmonds*, 2009 WL 4263142, at *3. Thomas read each card to Agnew, one at a time, while holding his hand. After almost two months in a coma, Agnew passed away.

## F

Hall, Derek, and Dewayne were jointly tried for murder, first-degree robbery, and first-degree sodomy. The trial commenced on January 26, 2007, and concluded on February 15, 2007. Prior to trial, Hall filed a motion to suppress his post-arrest statements to Detective Williamson, which was denied on December 21, 2005. Hall also filed a motion in limine to exclude Kaye Thomas's testimony as irrelevant, and that motion was denied. The trial court held that Thomas could testify that she read letters to Agnew, but any testimony "that [Agnew's] case garnered national attention or that people from around the nation sent [him] letters" was not allowed.[6] *Id.* Finally, Hall successfully moved to exclude Milligan's testimonial statements, after the prosecution and defense counsel were unable to locate him, because the statements were hearsay

---

[6] The court indicated that Thomas "could not testify about what other individuals did for [Agnew], including any sympathy or get well cards he may have received as a result of Thomas's nationwide efforts." R&R 5, *Hall v. Beckstrom*, No. 11-00404 (W.D. Ky. July 16, 2012).

and had not been subjected to cross-examination. The trial court, in an order dated January 24, 2006, excluded any mention of Milligan's statements.

Despite the court's ruling excluding Milligan's statements, Dewayne's defense attorney discussed Milligan and his identification of Hall during opening statements (over Hall's timely objection). Detectives Wheeler and Williamson also referred to Milligan's statements during their testimony, again over Hall's objections. The trial court allowed Detective Wheeler to testify that Milligan picked Hall out of a photo pack lineup and that Milligan claimed to have seen two black men in the alleyway beating Agnew. The court allowed Detective Williamson to testify that he was told by "other officers" that Milligan had seen two men in the alley and then identified Hall.[7] Hall moved for a mistrial based on Milligan's subsequent failure to testify, but the trial court denied the motion, although it did instruct the jury not to consider any evidence regarding Milligan and the photo pack lineup.

The prosecution introduced Thomas's testimony during the guilt phase of trial as a "humanizing" witness. Pursuant to *McQueen v. Commonwealth*, 669 S.W.2d 519 (Ky. 1984), Kentucky law allows for a "humanizing witness" to "bring[] to the attention of the jury that the victim was a living person, more than just a nameless void left somewhere on the face of the community." *Id.* at 523. During her 18-minute testimony, Thomas described Agnew's condition, such as his internal organs being left exposed outside of his body due to the damage and swelling in his torso. She also described paralysis on the left side of Agnew's body and the continual jerking of his right hand, which she held in her own as he died.

Although the trial court had limited her testimony, Thomas testified that Agnew received a total of 6,286 cards, some from as far away as Brazil and Australia. She further added that on one

---

[7] *Edmonds v. Commonwealth*, No. 2007-SC-000350-MR, 2009 WL 4263142, at *6 (Ky. Nov. 25, 2009).

occasion, when Agnew received 666 cards on a single day, she purchased an additional card because she "thought he'd already met the devil once and he didn't need to meet him again." *Edmonds*, 2009 WL 4263142, at *3. Thomas testified in detail concerning how she "read to [Agnew] these wonderful, magical cards that were all filled with love and compassion and hope and inspiration to someone who probably hadn't gotten a lot of cards in his life." *Id.* at *4.

Hall did not object during Thomas's testimony, but he moved for a mistrial after her direct examination, claiming she exceeded the permissible bounds of humanizing testimony. The trial court denied the motion because Thomas's testimony caused "no prejudice." *Id.*

While the trial was ongoing, Dewayne pleaded guilty to the reduced charge of second-degree robbery in return for the dismissal of the murder and sodomy charges. At the conclusion of the guilt phase of the trial, the jury found both Hall and Derek guilty of murder, first-degree robbery, and first-degree sodomy. The jury fixed Derek's sentence at life without the benefit of parole. Hall's sentence was fixed at life without the benefit of parole for 25 years.[8] The trial court entered final judgment as to both defendants on April 20, 2007.

## G

Hall contested his conviction and sentence on direct appeal, but the Kentucky Supreme Court affirmed both. *See Edmonds*, 2009 WL 4263142. In addition to many other issues, Hall raised the

---

[8] As noted above, Hall moved to suppress his April 6 and July 20 statements, and he filed a motion in limine to exclude Milligan's statements from trial. After the trial court denied Hall's motion to suppress his statements, Hall agreed to testify at trial "in return for the promise of the Commonwealth not to seek a sentence of life without the possibility of parole." R&R 4, *Hall v. Beckstrom*, No. 11-00404 (W.D. Ky. July 16, 2012). Hall then did testify at trial. It should be emphasized that Hall only entered into the agreement to waive his Fifth Amendment right after his motion to suppress was denied; his waiver made no mention of Milligan's statements. *See* Def.'s Resp. Ex. 2, at 15, *Hall v. Beckstrom*, No. 11-00404 (W.D. Ky. Nov. 2, 2011). Indeed, despite their later erroneous admission, Milligan's statements were ruled *inadmissible* by the trial court in January 2006. Thus, the trial court's decision denying Hall's motion to suppress was likely the reason that Hall decided to testify at trial, not the subsequent "introduction of Milligan's statement," as he argues in his brief. *See* Appellant Br. 36.

same three issues he does in this appeal: that the trial court erred when it admitted (1) his April 6 and July 20, 2004 statements, (2) Kaye Thomas's testimony, and (3) Larry Milligan's statements.

The Kentucky Supreme Court concluded that—despite his low IQ—Hall's April 6 and July 20, 2004 statements were both voluntary and properly admitted. *Id*. at *14. As to Kaye Thomas's testimony, the Kentucky Supreme Court explained that much of the testimony "was not about the victim, but was instead about [Thomas's] reaction and the community's response to [Agnew's] plight . . . ." *Id*. at *5. The court made clear that the "portions of Thomas's testimony that exceeded permissible humanizing evidence were error." *Id*. However, the court held that "[u]nder the circumstances of this case, Thomas's testimony was harmless error. There is overwhelming evidence of the Appellants' guilt, including blood on the Appellants' clothing, DNA evidence linking the blood to Clifton Agnew, Hall's confession, and Hall's testimony at trial implicating both himself and Edmonds." *Id*. Chief Justice Minton and Justice Noble dissented, concluding that "the erroneous admission of Kay [sic] Thomas's testimony" was not harmless error because the testimony was "emotional and echoing with community anger," and therefore "had a substantial effect on the guilty verdict in th[e] case." *Id*. at *19, *22.

The Kentucky Supreme Court also determined that admission of Milligan's statements through Detectives Wheeler and Williamson was in error. *Id*. at *6. However, the court determined that this error was harmless as well because Hall "had confessed in multiple statements that he was present at the crime" and therefore "there is no reasonable basis to believe that the statements had a substantial effect on the verdict against Hall, since they did little more than place him at the scene." *Id*.

## H

On July 19, 2011, Hall filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court referred the petition to a United States Magistrate Judge, who authored a 130-page report and recommendation (R&R) recommending that Hall's petition be denied with prejudice. Hall filed objections, but the district court overruled them and adopted the R&R "in full." Op. & Order 4, *Hall v. Beckstrom*, No. 11-00404 (W.D. Ky. Sept. 28, 2012). The district court dismissed the petition with prejudice on September 28, 2012, and declined to grant a certificate of appealability under 28 U.S.C. § 2253(c). *Id.* On January 3, 2013, however, the district court vacated the portion of the opinion denying a certificate of appealability and granted a certificate as to five of Hall's claims.

On appeal, Hall pursues three of those claims, asserting that: (1) the admission of his two statements to the police violated his Fifth Amendment *Miranda* rights and his Sixth Amendment right to counsel; (2) the admission of victim-impact testimony from Kaye Thomas violated his due process right to a fundamentally fair trial and was prejudicial; and (3) the admission of Larry Milligan's testimonial statements violated his Sixth Amendment right to confront the witnesses against him and was prejudicial. The State, on the other hand, argues that "[t]he district court judge properly concluded that the Opinion of the Supreme Court of Kentucky was not an unreasonable application of clearly established Federal law." Appellee Br. 13.

## II

The district court had jurisdiction over Hall's petition for habeas corpus pursuant to 28 U.S.C. § 2254. This Court has jurisdiction over Hall's appeal pursuant to 28 U.S.C. § 1291.

In a habeas appeal, we review a district court's legal conclusions de novo and a district court's factual findings for clear error. *Moore v. Mitchell*, 708 F.3d 760, 774 (6th Cir. 2013)

(collecting cases). Because Hall initiated his habeas petition after the enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA) in 1996, AEDPA's provisions apply to his case. *Murphy v. Ohio*, 551 F.3d 485, 493 (6th Cir. 2009). AEDPA requires that a federal habeas court defer to state court determinations on issues the state court addressed on the merits:

> [A] district court shall not grant a habeas petition with respect to any claim that was adjudicated on the merits in the state courts unless the adjudication resulted in a decision that: (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented to the state courts.

*Moore*, 708 F.3d at 774 (citing 28 U.S.C. § 2254(d)).

This Court instructs that "in a habeas proceeding the petitioner has the burden of establishing his right to federal habeas relief." *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (en banc) (internal quotation marks and ellipsis omitted). Not every constitutional error in a state court proceeding merits the issuance of a writ of habeas corpus, only those that "undermine confidence in the fundamental fairness of the state adjudication . . . ." *Titlow v. Burt*, 680 F.3d 577, 586 (6th Cir. 2012), *reversed on other grounds by Burt v. Titlow*, 134 S. Ct. 10 (2013) (quoting *Williams v. Taylor*, 529 U.S. 362, 375 (2000)). In short, Hall "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Moore*, 708 F.3d at 775 (quoting *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011)).

Under AEDPA's "contrary to" clause, a federal court "may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Moore*, 708 F.3d at 774 (citing *Williams*, 529 U.S. at 412–13). A state court decision is considered "contrary to" clearly established federal law under § 2254(d)(1) if the

two are "diametrically different, opposite in character or nature, or mutually opposed." *Titlow*, 680 F.3d at 585 (citation omitted). Alternatively, to be deemed an "unreasonable application" of clearly established federal law under that subsection, "a state-court decision on the merits must be 'objectively unreasonable,' not simply incorrect." *Id*. (internal citations omitted).

To demonstrate that a state court's decision was based on an unreasonable determination of the facts under § 2254(d)(2), a petitioner must both establish the "unreasonable determination" and show "that the resulting state court decision was based on that unreasonable determination." *Id*. (internal quotation marks omitted) (quoting *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011)). "The state court's findings of fact are presumed to be correct unless they are rebutted by clear and convincing evidence." *Titlow*, 680 F.3d at 586 (citing *Benge v. Johnson*, 474 F.3d 236, 241 (6th Cir. 2007)).

### III

Although Hall contests the admission of his statements to Detective Williamson with his third claim of error, the claim will be addressed first because the Kentucky Supreme Court relied upon the statements while addressing Hall's other two claims. *See Edmonds*, 2009 WL 4263142, at *5, *6. Hall argues that his April 6, 2004 statement was involuntary and that he did not knowingly and intelligently waive his *Miranda* rights before providing it. Appellant Br. 39–51. He argues that his July 20, 2004 statement was taken in violation of his *Miranda* rights and his Sixth Amendment right to counsel. *Id*. at 51–54. Hall concludes that the introduction of both statements was prejudicial. *Id*. at 55.

The Kentucky Supreme Court addressed these issues on the merits in its November 2009 opinion. Thus, the proper inquiry here is not whether Hall waived his *Miranda* rights voluntarily, knowingly, and intelligently. Rather, the focus is on the question of whether the Kentucky Supreme

Court's conclusions on these issues were "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Moore*, 708 F.3d at 775 (citation omitted). The Kentucky Supreme Court's decisions were not unreasonable and habeas relief is not warranted on these claims.

## A

Hall argues that the Kentucky Supreme Court's determination concerning his April 6, 2004 statement was based "on an unreasonable determination of the facts in light of the evidence presented at trial." Appellant Br. 47. He also claims that the court's decision violated clearly established law. *Id.* Hall is mistaken on both counts.

The Supreme Court has recognized that a proper *Miranda* waiver must be made "voluntarily, knowingly and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citation omitted). The inquiry has "two distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* (collecting cases). The totality-of-the-circumstances inquiry requires a court to examine "all the circumstances surrounding the interrogation, including the suspect's age, experience, education, background, and intelligence, and whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Padgett v. Sexton*, 529 F. App'x 590, 597 (6th Cir. 2013) (internal quotation marks and brackets omitted) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

**1**

The first issue is whether Hall's April 6, 2004 statement was voluntary. Because *Miranda*'s "sole concern" is "governmental coercion," the admission of a confession absent state coercion does "not violate the Constitution." *Givens v. Yukins*, 238 F.3d 420, 2000 WL 1828484, at *9 (6th Cir. 2000) (brackets and citation omitted) (unpublished). Indeed, Hall acknowledges that "[c]oercive police activity is a necessary predicate to a finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Appellant Br. 40 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).

The Kentucky Supreme Court concluded that under the totality of the circumstances surrounding Hall's confession, "including Hall's mental retardation," there was nothing "inherently or objectively coercive about the interrogation in this case." *See Edmonds*, 2009 WL 4263142, at *14. The district court concluded that the Kentucky Supreme Court "reasonably concluded that no coercion sufficient to overbear Hall's will was practiced by Det. Williamson on April 6, 2004, during the hour-long interview." R&R 76, *Hall v. Beckstrom*, No. 11-00404 (W.D. Ky. July 16, 2012).

Attempting to rebut both courts' conclusions, Hall takes issue with the factual determinations the decisions were based upon. He first indicates that the Kentucky Supreme Court "stated Hall was not deprived of food, sleep or medical attention." Appellant Br. 47 (citation omitted). He argues that contrary to these conclusions, he "had been without adequate sleep for over 24 hours, he had not eaten that day, and his hand was swollen and medical treatment had not been rendered." *Id*.

However, Hall has not demonstrated with "clear and convincing evidence," *Titlow*, 680 F.3d at 586 (citation omitted), that the Kentucky Supreme Court's factual determinations were unreasonable. First, Hall has produced no evidence that he was deprived of sleep. True, he may

have been tired during the interview; Detective Williamson even commented: "Okay, go ahead. You act like you're as sleepy as me." Apr. 6, 2004 Interview Tr. 3. But Hall only responded with laughter, *id*.; he did not indicate that he was tired or that he was unable to participate in an interview. Moreover, as Hall told Detective Williamson, he did not sleep before he was picked up because of what he saw in the alley, *see* Apr. 6, 2004 Interview Tr. 17, 45–46, so there was no police conduct that contributed to his fatigue.

Nor was Hall deprived of food. The first and only comment he made about food during the course of his hour-long interview with Detective Williamson came during the following exchange at the interview's conclusion:

Williamson: O.K. Let me get you a coke, okay. Anything else; you hungry or anything?

Hall: I didn't eat no breakfast this morning.

Williamson: You want, maybe some chips or something? Will that work?

Hall: Some…

Williamson: O.K. You'll be all right. I'll take care of you, okay. Just sit tight, don't monkey with anything. O.K.

Hall: Yes, sir.

*Id*. at 53–54. As soon as Hall indicated he was hungry, Williamson responded by trying to find him something to eat. And, missing a single meal is not enough to render a *Miranda* waiver involuntary.

Further, although Hall's hand was swollen, he was not denied medical treatment. Detective Williamson acknowledged during the interview that Hall's hand was swollen. *Id*. at 9. But Hall did not say that it hurt, or request medical attention, or even stay with the issue. He acknowledged, "Yes, sir, my hand is swollen," and moved directly to an explanation: "I hit the guy one time but anything else that happened, I don't know what, you know, went on after that." *Id*. Hall never

mentioned his hand again, but instead continued to actively participate in the interview. Once the interview was over, Detective Williamson took Hall to receive medical attention. R&R 79, *Hall v. Beckstrom*, No. 11-00404 (W.D. Ky. July 16, 2012).

Hall has not rebutted the state court's conclusions that he was not deprived of sleep, food, or medical treatment prior to or during the April 6 interview. *See United States v. Brooks*, 125 F.3d 484, 491 (7th Cir. 1997) ("sleep deprivation, and a hand injury at the time the FBI agent asked him to waive his *Miranda* rights" did not foreclose a voluntary waiver where defendant "gave no indication that he was seriously sleep-deprived" and "never complained of great pain"). The district court's conclusion that those factual determinations are reasonable should stand.

Next, Hall takes issue with the Kentucky Supreme Court's statement that he "had prior contacts with law enforcement." Appellant Br. 47. He asserts that his only "contact with law enforcement came when he was nine years old." *Id*. But even if this is true, it still does not render the Kentucky Supreme Court's conclusion unreasonable; Hall *did* have limited prior contact with law enforcement. That is all the Kentucky Supreme Court said. *See Edmonds*, 2009 WL 4263142, at *13 (indicating that Hall "had prior contact with law enforcement").

In addition, during his interview with Detective Williamson, Hall expressly indicated, "there's a dope charge on me . . . ." Apr. 6, 2004 Interview Tr. 51. He also established that he "knew something" about "Linda the lady that got killed," and that he was going to contact "Detective Huffman" about it. *Id*. at 17. Hall said that he had Detective Huffman's card. *Id*. So, at least according to Hall, his contact with law enforcement did not end at the age of nine. Nevertheless, Hall offers no evidence, much less clear and convincing evidence, to undermine the Kentucky Supreme Court's conclusion that he had experience with law enforcement prior to his

April 6, 2004 confession. The district court held this finding of fact was reasonable, and that decision was not erroneous.

Hall also contests the Kentucky Supreme Court's conclusion that he almost immediately confessed. He argues that this is an unreasonable determination of the facts given the transcript of the April 6 interview: "Hall clearly did not tell Williamson all the details about the different crimes involved until Williamson kept pushing him." Appellant Br. 47.

However, based on the transcript, the Kentucky Supreme Court's conclusion was not unreasonable. On page seven of the interview transcript, Detective Williamson begins asking about an "assault case" he was working on. Apr. 6, 2004 Interview Tr. 7. Less than two pages later, Hall admits that he "hit the guy" near "the Salvation Army in the alley." *Id*. at 9. By page 12, Hall admits that he was with Derek Edmonds at the time. *Id*. at 12. On the next page, he admits he also used a crockpot and a trashcan to batter the victim. *Id*. at 13. Accordingly, all the transcript shows is that within a short span of being asked about the incident in the alley, Hall confessed to being there and hitting Agnew with his hands, a crockpot, and a trashcan. There was nothing unreasonable about the Kentucky Supreme Court's conclusion that Hall confessed "almost immediately."

Finally, Hall argues that the "Kentucky Supreme Court's assessment of Williamson's interrogation techniques [was] an unreasonable determination of the facts" because "Williamson used a ruse" and "proceeded by 'pulling Hall along and asking him to go just one step further and to tell him some more.'" Appellant Br. 48 (citation omitted). Hall then claims that the district court's similar conclusions of fact were "erroneous." *Id*. at 48–49.

Hall accurately asserts that Detective Williamson said some things during the interview that were not true: Derek was not in custody while Hall was interviewed, yet Williamson stated, "Derek's being a man about his part," Apr. 6, 2004 Interview Tr. 16, and "Derek's answering to his

part, too.  O.K.  You know there's not gonna be any secrets about this before its [sic] over, you know, the thing you need to do is make yourself look better.  O.K.," *id*. at 29.

However, "[n]ot every deception by the police amounts to coercion or even impropriety." *Harris v. Hatfield*, 21 F.3d 427, No. 93-5826, at *3 (6th Cir. 1994) (unpublished).  Indeed, police trickery alone will not invalidate an otherwise voluntary statement.  *See Frazier v. Cupp*, 394 U.S. 731, 737–39 (1969) (police misrepresentation of facts did not render an "otherwise voluntary confession inadmissible"); *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994) ("A defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is.").  So, although Detective Williamson lied about what he knew, Hall offers no other evidence to indicate that, under the totality of the circumstances, his confession was coerced.  During the interview Detective Williamson did not threaten Hall, expressly or even impliedly, and the transcript indicates that Williamson was kind and thoughtful throughout.  The Kentucky Supreme Court's conclusion that Williamson's conduct was not coercive was not, as Hall now suggests, an "unreasonable determination of the facts."  The district court's assessment that the Kentucky Supreme Court's conclusion was based upon "several good reasons," R&R 80, *Hall v. Beckstrom*, No. 11-00404 (W.D. Ky. July 16, 2012), was not erroneous.

Because Hall did not rebut the Kentucky Supreme Court's conclusions of fact regarding the voluntariness of his confession with clear and convincing evidence, those conclusions are entitled to deference.  *See* 28 U.S.C. §2254(e)(1).  In turn, the district court's determination that the Kentucky Supreme Court's conclusions are not unreasonable was sound.

Hall also indicates that one portion of the Kentucky Supreme Court's opinion was "contrary to established law": its failure to make the voluntariness determination "on a case by case basis." Appellant Br. 48.  Hall indicates that the court "dealt with Hall's mental retardation by

acknowledging his IQ but dismissing its ramifications saying it was not as low as a defendant in a Kentucky case cited by the court." *Id*. The district court's conclusion on this issue is reviewed de novo. *See Seymour v. Walker*, 224 F.3d 542, 553 n.3 (6th Cir. 2000) ("voluntariness of a confession is a question of law") (citations omitted). Hall's argument fails.

The Kentucky Supreme Court addressed Hall's case on an individual basis and rendered a decision based on the totality of the circumstances. The court acknowledged that Hall had been found to be "seriously mentally retarded" by the trial court. *Edmonds*, 2009 WL 4263142, at *12. But the court emphasized, correctly, that an "Appellant's mental retardation is a *factor* to consider in assessing the voluntariness of a confession," not a dispositive element. *Id*. at *13 (emphasis in original). The court then addressed the totality of the circumstances present in Hall's case before rendering a conclusion:

> Hall's interrogation with police began less than an hour after he was arrested, and it lasted just over an hour. Hall was also read his *Miranda* rights and signed a waiver form. He almost immediately confessed. He was not deprived of food, sleep, or medical attention. While he was found to be mentally retarded, his recorded IQ scores were higher than those of the defendant in *Bailey*. Hall also reads at a second-grade level, attended special education classes into the eleventh grade, and had prior contact with law enforcement. He was found to be competent to stand trial.

*Id*. Based on all of those factors, the Kentucky Supreme Court determined that Hall's confession was not involuntary simply because of his low IQ score.

This determination was not contrary to federal law because the Supreme Court has expressly "redefine[d] voluntary confessions to include confessions by mentally ill individuals," *Colorado v. Connelly*, 479 U.S. 157, 181 (1986) (Brennan, J., dissenting), and federal appellate courts "have found several instances where defendants, despite their mental retardation or low I.Q.'s," properly waived their *Miranda* rights, *Clark v. Mitchell*, 425 F.3d 270, 283–84 (6th Cir. 2005) (collecting cases).

Because the Kentucky Supreme Court's conclusion that Hall voluntarily waived his *Miranda* rights before his April 6, 2004 statement was neither contrary to or an unreasonable application of clearly established federal law, nor based upon an unreasonable determination of the facts, the district court did not err when it concluded as much.

**2**

Hall also argues that on April 6, 2004 he did not waive his *Miranda* rights knowingly and intelligently. Hall's arguments are unpersuasive.

According to Hall, neither the Kentucky Supreme Court nor the district court "refuted the evidence from Dr. Herner that Hall could not have comprehended the form in the 50 seconds he looked at it." Appellant Br. 50. We have held, however, that the relevant question is not whether the "criminal suspect knew and understood every possible consequence of a waiver of the Fifth Amendment privilege, but rather whether the suspect knew that he could choose not to talk to law enforcement officers, or to talk only with counsel present, or to discontinue talking at any time." *Garner*, 557 F.3d at 261 (internal quotation marks and brackets omitted) (quoting *Colorado v. Spring*, 479 U.S. 564, 574 (1987)). Whether a waiver is knowing and intelligent presents "a mixed question of law and fact" that is to be "review[ed] de novo." *Lott v. Coyle*, 261 F.3d 594, 610 (6th Cir. 2001) (citation omitted).

The Kentucky Supreme Court's November 2009 opinion does not expressly indicate whether Hall's April 6, 2004 *Miranda* waiver was knowing and intelligent, only that it was voluntary. Accordingly, it is unclear whether the court addressed the issue on the merits and AEDPA deference applies. *See Vasquez v. Jones*, 496 F.3d 564, 569 (6th Cir. 2007) (explaining that when a habeas claim is raised in state court but not reviewed on "the claim's merits, AEDPA deference does not apply, and the federal habeas court reviews legal issues de novo."). Courts can, however, "deny

writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review." *Berguis v. Thompkins*, 130 S. Ct. 2250, 2265 (2010) (citation omitted). Regardless of whether AEDPA's deferential standard of review applies, Hall is not entitled to relief even under de novo review.

There is ample evidence that Hall understood his *Miranda* rights and waived them knowingly and intelligently. He received a written copy of the *Miranda* warnings, Detective Williamson determined that Hall could read and understand English, and Hall was given time to read the warnings. Hall then initialed next to each of the five enumerated lines under "Your Rights" and went on to sign a "Waiver of Rights," which provided:

> I have read this statement of my rights or have had it read to me and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure of coercion of any kind has been used against me.

Apr. 6, 2004 Interview Tr. 1. Detective Williamson then asked if Hall "understood that?" and he responded "Uh-huh." *Id*. at 2. Detective Williamson again asked Hall if he "understood those rights?" and Hall said, "Yes, sir." *Id*. As recognized by the Supreme Court, "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver . . . ." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

In addition, Hall demonstrated that he understood he could refuse to offer up information if he so desired. At one point during questioning, Hall indicated that he was not "saying nobody else's names as with me," and Detective Williamson responded that he did not have to. Apr. 6, 2004 Interview Tr. 9.

Further, a defendant's "explanation of his conduct during the commission of his crimes" can "serve[] to confirm his capacity to understand the *Miranda* warnings." *Garner*, 557 F.3d at 261. For example, in *Garner*, the defendant "explained to police that he started the couch fire to rid the couch of any fingerprints that he may have left." *Id*. The Court concluded that the defendant's explanation of his conduct supported a finding that he was competent to waive his *Miranda* rights and admit to that conduct:

> Garner had the capacity to understand the criminal nature of his actions and the consequences of those actions. That Garner had this capacity at the time that he committed the crimes suggests that, when questioned about those crimes on the next day, Garner also had the capacity to understand and appreciate the consequences of speaking to police about his criminal conduct.

*Id*. (collecting cases).

The same is true here. While talking to Detective Williamson, Hall made clear he understood that he had done something wrong and that he faced serious consequences. Hall told Williamson he was "scared shitless," Apr. 6, 2004 Interview Tr. 17, and that he knew he would "serve some big time for this," *id*. at 50. Hall also indicated that when he "first walked up to the Salvation Army, [he] wanted to turn [him]self in for it" because he thought he "just killed somebody." *Id*. at 52. Hall's statements establish that he understood the criminal nature of his actions and the associated consequences. As in *Garner*, Hall's ability to understand his actions supports a finding that he had the capacity to waive his *Miranda* rights and admit to those actions.

Hall argues that the district court mistakenly indicated that the totality of the circumstances test need be applied only to what the police officers knew, taking no account of what he understood. Appellant Br. 50. Hall is correct that *Garner* establishes that whether a *Miranda* waiver is knowing and intelligent is based "primarily from the perspective of the police." *Garner*, 557 F.3d at 263. The district court, while addressing all the other factors bearing upon whether Hall's waiver was

knowing and intelligent, indicated: "One must also take into account that the perspective to be analyzed is that of Det. Williamson, not that of Hall." R&R 81, *Hall v. Beckstrom*, No. 11-00404 (W.D. Ky. July 16, 2012). So instead of viewing the facts *primarily* from the perspective of the police, the district court arguably viewed them *solely* from that perspective.

Even if the district court relied too heavily on Detective Williamson's point of view, it is irrelevant assuming that we review this issue de novo. *Lott*, 261 F.3d at 610. Hall made no comment and took no action during the interview that would indicate his *Miranda* waiver was anything but knowing and intelligent, and he waived his *Miranda* rights both verbally and in writing. *See Butler*, 441 U.S. at 373 ("express or oral statement of waiver . . . is usually strong proof of the validity of that waiver"). Because Hall's April 6, 2004 waiver was shown to be knowing and intelligent, denial of habeas relief was appropriate. *See Berguis*, 130 S. Ct. at 2265 (2010).

Accordingly, the Kentucky Supreme Court's conclusion that Hall properly waived his *Miranda* rights on April 6, 2004, and the district court's determination that the Kentucky Supreme Court's conclusion was reasonable, were also both sound.

**B**

Hall argues that the second statement he provided to Detective Williamson violated his Fifth Amendment *Miranda* rights and his Sixth Amendment right to counsel. But Hall voluntarily, knowingly, and intelligently waived his Fifth and Sixth Amendment rights before speaking to Detective Hall, and the Kentucky Supreme Court's determination to that effect was not unreasonable. The district court's agreement with the Kentucky Supreme Court was therefore proper.

**1**

Hall argues that his July 20, 2004 statement was not voluntary because "*Miranda* warnings [were] not given." Appellant Br. 52. But this is simply not the case.

Indeed, Hall did receive his *Miranda* warnings before giving his statement on July 20, 2004. First, Hall initiated contact with Detective Williamson, not the other way around. Hall said, "Um, there was a few things that I needed to tell you that I didn't tell you at first about this case; like I'm almost in discovery." July 20, 2004 Interview Tr. 56. Once Hall began relaying information, Detective Williamson stopped him: "All right, well, hold on just a second because I didn't know what—what all this was gonna be." *Id*. Detective Williamson then ensured that Hall intended to waive his rights before providing further information:

Williamson:  O.K. And um, you know, when I originally brought you in, I advised you of your Rights. Do you remember that?

Hall:  Yes, sir.

Williamson:  And you're waiving those Rights and the right to an attorney, and you've been arraigned on this assault charge, right?

Hall:  Yes, sir.

Williamson:  O.K. And you know that there's an indictment for murder coming or I'm going to attempt to get an indictment for murder, right?

Hall:  Yes, sir.

Williamson:  O.K. So you're… you want to tell me the rest of this?

Hall:  Yes, sir.

Williamson:  O.K. Um, so at this time you want to waive your Right to counsel and talk to me about it?

Hall:  Yes, sir.

*Id*. at 57–58. The interview continued after Williamson's warnings. Moreover, Hall never indicated that he did not understand his rights or the potential consequences of talking to Detective Williamson.

Hall argues the *Miranda* warnings were insufficient because Detective Williamson "never used the term 'Miranda.' " Appellant Br. 52. But the Supreme Court has established that "*Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures." *California v. Prysock*, 453 U.S. 355, 359 (1981). Rather, all that is required is *Miranda* warnings "*or their equivalent*." *Id*. at 360 (emphasis in original) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980)). Detective Williamson sufficiently presented Hall with *Miranda* warnings, or at least their equivalent. He asked if Hall remembered his rights; Hall said that he did. Williamson asked Hall if he wanted to waive those rights; Hall said that he did. Williamson then specifically asked Hall if he wanted to waive his right to counsel and Hall said that he did. Detective Williamson confirmed that it was Hall who initiated the conversation:

| Williamson: | And let me verify something while we're on tape. Now you had Ms. Jarit[9] call me; is that right? |
|---|---|
| Hall: | Yes, sir. |
| Williamson: | And she's called me several times; we just kind of missed each other. |
| Hall: | Yes, sir. |
| Williamson: | And you did it of your own freewill? I haven't made you any threats or promises or told you I could help you in any way; have I? |
| Hall: | No, sir. |

July 20, 2004 Interview Tr. 75.

---

[9] Ms. Jarit was not Hall's attorney. She ostensibly worked for the facility where Hall was being held at the time of the July 20, 2004 phone call and facilitated the communication between Hall and Detective Williamson.

This evidence supports the Kentucky Supreme Court's conclusion that Hall voluntarily waived his *Miranda* rights before giving his July 20, 2004 statement. At the very least, based on these circumstances, and the fact that it was Hall who initiated contact, whether his waiver was voluntary is at least subject to debate. *See Butler*, 441 U.S. at 373; *United States v. Krankel*, 164 F.3d 1046, 1050–51 (7th Cir. 1998) ("[D]efendant freely and voluntarily wanted to and did in fact give the police the statement . . . Because the defendant initiated contact by repeatedly telephoning Harms to request a meeting . . . the *Edwards* exception to the general *Miranda* rule governs and makes his statement admissible."). The Kentucky Supreme Court's conclusion that the waiver was voluntary was not unreasonable, and the district court's holding that it was not unreasonable is affirmed.

**2**

Based on the transcript, whether Hall understood the rights he was forsaking is subject to argument, and therefore the Kentucky Supreme Court's determination was reasonable and should not be overturned. Hall indicated to Detective Williamson that he remembered his rights and still wanted to waive them. He also established that he was prepared to testify against Dewayne, and that he only left him out of the first statement because he "was scared at first." July 20 Interview Tr. 70. Thus, Hall was aware that his statements to Detective Williamson could lead to further legal entanglement. Moreover, as noted above, Hall made clear that it was he who wanted to talk to Detective Williamson, not vice versa. The transcript indicates that Hall had made several attempts to reach Williamson before contact was finally made on July 20, 2014.

The Supreme Court has noted that whether a waiver is knowing and intelligent is based upon the specific facts of each case:

> A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver

. . . must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.

*Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). The facts of this case indicate that Hall knew he could abstain from speaking to the police, but that he was desperate to do just the opposite so that he did not "take the fall" for the crimes against Agnew.

Hall argues that because Detective Williamson used a compound question—"And you're waiving those Rights and the right to an attorney, and you've been arraigned on this assault charge, right?"—"[i]t is impossible to know what Hall was answering yes to—both parts of this compound question or just the last part that he had been arraigned." Appellant Br. 52. This argument is not persuasive. The circumstances show that Hall wished to waive his *Miranda* rights and speak to the police. He indicated at the beginning of the conversation, and then again at the end, that he placed the phone call "of [his] own freewill." July 20, 2004 Interview Tr. 75. Hall made no indication that he was confused by Detective Williamson's question. The fact that Hall answered "Yes, sir" to a compound question does not mean that his *Miranda* waiver was not voluntarily and intelligently made.

The Kentucky Supreme Court's conclusion that Hall knowingly and intelligently waived his *Miranda* rights on July 20, 2004 was reasonable under the AEDPA standard of review. The district court's conclusion on this issue is affirmed.

**3**

Hall also alleges that the "waiver of his Sixth Amendment right to counsel during his second statement to the police detective was not knowing and voluntary for the same reasons his waiver of his Fifth Amendment right under *Miranda* was not knowing and voluntary." Appellant Br. 51. But

Hall's waiver of *Miranda* rights was knowing and voluntarily. For the same reasons, the waiver of his Sixth Amendment right to counsel was knowing and voluntary.

The Supreme Court has "place[d] beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant . . . ." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (citation omitted). "The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled." *Id.* (citation omitted). Notably, "when a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick . . . ." *Id. See also Patterson v. Illinois*, 487 U.S. 285, 296 (1988) ("As a general matter, then, an accused who is admonished with the warnings prescribed by this Court in *Miranda* . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one.").

Before making the July 20, 2004 statement, Hall was properly advised of his *Miranda* rights, and he executed a knowing, voluntary, and intelligent waiver of those rights. He also established that despite having counsel, he wished to waive any related rights and speak with Detective Williamson. *See* July 20, 2004 Interview Tr. 58. The Kentucky Supreme Court's determination that Hall's waiver of his Sixth Amendment right to counsel was valid was therefore not unreasonable.

**IV**

Although Kentucky law allows for testimony from "humanizing" witnesses to make victims real for juries as opposed to some faceless "statistic," *see McQueen v. Commonwealth*, 669 S.W.2d 519, 523 (Ky. 1984), the Kentucky Supreme Court established that Kaye Thomas's testimony went further than Kentucky law permits. The court concluded that "much of Thomas's testimony was evidence of the effect of the crime on others, and not mere victim background evidence." *Edmonds*,

2009 WL 4263142, at *5. Accordingly, the Kentucky Supreme Court focused on whether the violation was harmless: "[a] non-constitutional evidentiary error must have a substantial influence on the jury's verdict to require reversal." *Id.* (citation omitted). The court concluded that Thomas's testimony was harmless in light of the "overwhelming evidence of [Hall's] guilt . . . ." *Id.*

Hall believes otherwise. He makes much of the fact that the Kentucky Supreme Court characterized this violation as a "non-constitutional evidentiary" one. He argues that these words reflect that the Kentucky Supreme Court did not address his constitutional claim on the merits, and accordingly he was entitled to de novo review in the district court. *See* Appellant Br. 12.

In *Harrington v. Richter*, 131 S. Ct. 770 (2011), the Supreme Court established that "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Id.* at 784. Thus, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 784–85.

In this case, the Kentucky Supreme Court analyzed Thomas's testimony without any mention of a constitutional violation. So this is not a case where the court decided Hall's claim and provided no explanation; the court decided Hall's claim and did so specifically under Kentucky law. But even under de novo review, Hall has not demonstrated that Thomas's testimony prejudiced him, and habeas relief is therefore not warranted on this ground. *See Culp v. Young*, 774 F.2d 1162, 1985 WL 13773, at *1 (6th Cir. 1985) (unpublished) ("Absent any prejudice in this case, it is clear that the district court properly dismissed the habeas petition.").

Contrary to Hall's assertion that victim impact testimony during the guilt phase of his trial violated his Eighth Amendment rights, the Supreme Court has established "that if the State chooses

to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Payne v. Tennesee*, 501 U.S. 808, 827 (1991). Even though *Payne* "simply dealt with the sentencing phase" of a case, we have "approved victim impact evidence during the guilt phase, rather than at sentencing, as an extension of *Payne*." *Hicks v. Collins*, 384 F.3d 204, 222 (6th Cir. 2004). Thus, so long as it is not prejudicial, there is nothing unconstitutional about a court in Kentucky allowing victim impact evidence during the guilt phase of a murder trial pursuant to *McQueen*.

And Hall has not demonstrated prejudice sufficient to warrant habeas relief; his claim that he was "denied a fundamentally fair trial by the admission of Thomas' testimony" is incorrect. As noted in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), to obtain relief, a habeas petitioner alleging a due process violation must demonstrate the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id*. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Indeed, this is the same prejudice standard the Kentucky Supreme Court applied to Hall's claim: "A non-constitutional evidentiary error must have a substantial influence on the jury's verdict to require reversal." *Edmonds*, 2009 WL 4263142, at *5 (citation omitted).

Applying the *Brecht* standard here, Hall has not demonstrated that Thomas's testimony had a "substantial and injurious effect or influence" on the jury. This is so, just as the Kentucky Supreme Court concluded, because of the overwhelming evidence of Hall's guilt. He gave two statements to law enforcement establishing that he was present during the atrocities committed against Agnew and he admitted beating Agnew with his fists and feet, hitting him with a crock pot and a trashcan, and stabbing him with a knife.[10] Aside from alleged verbal requests, he did nothing

---

[10] As explained by medical professionals, Agnew's death was caused by head trauma and blood loss, both of which Hall admittedly contributed to (by punching and kicking Agnew, and then stabbing him in the leg). So even if he had nothing to do with the sodomy, a proposition the jury rejected, there was sufficient evidence to convict him of the murder charge.

to prevent Derek Edmonds from inserting two sticks into Agnew's rectum for minutes at a time, one of which went far enough to puncture Agnew's lung. Finally, blood spatters on Hall's pants matched Agnew's DNA and confirmed his involvement in the beating. Thomas's testimony was irrelevant to the question of guilt, which was supported by these relevant and powerful facts.

Thomas testified for less than twenty minutes in a trial that lasted weeks. Yes, she cried, but such a thing is not unusual in a murder trial involving suffering as extreme as this. Yes, Thomas said Agnew had "met the devil," but both Derek and Hall were on trial together, and it was Hall's theory of the case that Derek had committed the worst crimes against Agnew. Thomas never directed her comments specifically at Hall; her statements may even have shifted blame away from him. Simply put, Thomas's testimony did not deny Hall a fair trial. Even under de novo review, Hall has not demonstrated prejudice sufficient to justify habeas relief.

## V

The final issue to be addressed is the admission of Larry Milligan's statements, which established that Hall was one of two men with Agnew in the alley. But like the admission of Thomas's testimony, while the admission of Milligan's statements was clearly erroneous, the error was harmless.

As Hall suggests, and as the Kentucky Supreme Court determined, see *Edmonds*, 2009 WL 4263142, at *6, admission of Larry Milligan's statements to the police, and his photo pack identification of Hall, violated the Kentucky Rules of Evidence and Hall's right to confront the witnesses against him. But like Thomas's testimony, the admission of Milligan's statements made no real difference in the outcome of Hall's trial.

Indeed, Milligan's statements simply placed Hall at the scene of the crime. But Hall did that himself when he told Detective Williamson, only minutes after the initial interview began, that he

hit Agnew in the alley by the Salvation Army and that he was present when Derek sodomized Agnew with various objects. Pursuant to *Brecht*, Hall suffered no prejudice when Milligan's statements—also placing him at the scene of the crime—were admitted erroneously.

One issue that arose during oral arguments warrants comment here: counsel for the Appellant and the Appellee both seemed to indicate that Milligan's statements were introduced during opening statements by Derek Edmonds's counsel rather than by Dewayne's counsel. Hall's appellate counsel maintained during argument that this made the evidence especially prejudicial because it enabled one co-defendant (Derek) simply to point the finger at the other co-defendant (Hall)—Hall being the only person Milligan had positively identified. Milligan's statements, however, were not introduced by Derek's counsel, but by counsel for Dewayne Edmonds before he pleaded guilty and was no longer a party to the case. This makes sense; Dewayne argued that Milligan only saw two men in the alley, and that he (the third man) was therefore innocent of any wrongdoing.

The fact that the statements were introduced by Dewayne, and not Derek, undermines Hall's argument that their introduction was especially harmful. Milligan's statements did not provide Derek an opportunity to blame Hall. Rather, the introduction of Milligan's statements simply substantiated Dewayne's assertion that he was innocent, and placed Derek and Hall at the scene of the crime. And, as explained above, the statements did not have a "substantial and injurious effect or influence" on the jury's verdict.

## VI

The Kentucky Supreme Court's decision affirming Hall's conviction and sentence was neither contrary to or an unreasonable application of clearly established federal law, nor based upon an unreasonable determination of the facts. Accordingly, we AFFIRM the district court's denial of Hall's habeas petition.